## The Wenona.

A steamer condemned for a collision with a sailing vessel, the wheelsman, mate, captain, and other witnesses on the sailing vessel swearing positively to courses and distances and times immediately prior to the collision, and these showing that the steamer was in fault; while though there was strong evidence on the steamer's side to show that these courses, distances, and times could not have been truly stated by the witnesses in behalf of the sailing vessel, this evidence was inferential chiefly; consisting of conclusions or arguments drawn from other facts sworn to, as *ex gr.*, the lights which the steamer saw and the lights which she did not see on the sailing vessel; and the effect of giving credence to this inferential or argumentative testimony being to convict as of necessity the witnesses for the sailing vessel of perjury.

Appeal from the Circuit Court for the Northern District of New York.

About nine o'clock in the evening of the 29th of November, 1869, heading east by north half north, the steam propeller Wenona was on her course down Lake Erie; her rate about ten miles an hour. The evening was somewhat dark and it was raining. There was a little mist on the water, but not enough to make what is called a fog. The wind was south, or south by east.

Going up the lake at the same hour, then, and for a half hour before, heading southwest by west half west, was the

schooner Frémont; her rate five or six miles an hour, all her canvas set, closehauled, though making some leeway.

Both vessels were well officered and had their proper lights properly stationed.

The vessels as they approached saw each other. The steamer saw that the vessel coming up was a sailing vessel, and the schooner before long saw that the vessel coming down was a steamer. The schooner kept on her course till a certain moment, when she changed her course. The steamer kept on *her* course till a certain moment, when she changed hers also. A collision took place, and the schooner with her cargo went to the bottom of the lake; her officers and crew having barely time to escape with their lives.

Her owner hereupon libelled the steamer in the admiralty. The question in the case was a pure question of fact. Did the steamer change her course, as she was bound by the rules of navigation to do, in time to enable the schooner safely to keep on *hers?* Did the schooner, when she changed *her* course, change it because the vessels had got so near that a collision seemed inevitable if she did not do so?

The question, of course, was to be decided by the evidence.

The LOOKOUT, on duty at the time, was examined; a man who had been a sailor for fifteen years, eleven of them on the ocean, and the rest upon the lake. He said:

"I was forward on the vessel. Our course was southwest by west half west. I saw the propeller's light; at first a bright light, right ahead. I reported it to the officer of the deck. He answered, and said 'I see it.' A minute or two afterwards I saw green and red lights; and I reported to the mate that there was a steamer ahead. The mate lit the torch and made a flash light. It was lit twice. It was a turpentine torch, and made a flash for two or three seconds. I watched the lights on the steamer; they appeared to me dead ahead, and seemed, if anything, to be gaining a little to the windward, until they opened out to our port bow, which was our weather bow. I could then see the red and bright light but not the green. The next thing I could see was that her green light shut in for a short time;

and I saw the red and bright light but not the green. Then both green and red opened out brightly, and the vessel seemed to be coming down on us; and to be not more than three times her own length from us, perhaps not that. I called the men below, to come on deck and to look out for themselves. In four or five minutes from the time I saw the bright light as near as I can give it—it might have been more or less—it could not have been many minutes more—the steamer struck us between stem and cathead; at an angle of something more than forty-five degrees. She was under way and came stem on."

The MATE, whose business for twenty-eight or twenty-nine years had been sailing, said:

"The captain came on deck as the second torch was lit; whether he or the cook lit it I can't say; one or the other. The propeller was then pointed right to us. The schooner's course had not been changed. Her course was southwest by west half west. I know that from the compass, and I am swearing from what I know of the compass course. She had been on that course since a little after eight o'clock. She kept on that course till the time the captain came on deck. When the propeller was standing right over us the captain gave order to the man at the wheel to 'hard aport.'"

The WHEELSMAN, who had been for three years on the ocean, for ten upon the lakes, and for the last-mentioned term in the habit of steering, said:

"After the lookout reported a light, I saw the light of the propeller; a bright masthead light. Our course—southwest by west half west—was taken before we saw that light. After I saw the three lights the propeller put off suddenly to the windward three or four points or more. It took her five seconds to go off to windward; I could not tell the time; it was sudden. I first saw her dead ahead, and then to windward. She shot to windward. When the vessels came together our course might have been west by south half south. The captain sang out, 'Put the helm hard up,' and the change was made. The propeller was then off our port bow, heading about midships for us, and our vessel was then perhaps half her own length from her. If I had not put the helm hard up, the propeller would

have struck us at the fore-rigging. I put the helm hard aport. *No other change was made in the course of our vessel from the time the white light was reported down to the collision.*

"I saw the bright light about eight minutes before the collision. The propeller must have then been a mile and a half from us. When I first saw her three lights I judge she might have been a quarter of a mile from us. She got three or four points off our port bow or more. This was not many minutes before the collision. It may have been two."

The MASTER, who was also the owner of the vessel, and had been sailing on the lakes for twenty years, said:

"I was in my cabin reading a newspaper. I heard through the windows the lookout report, 'Light ahead.' The mate said, 'Steady. Don't let her fall off.' The mate then said to me, 'Light this torch,' handing it to me. I dropped my paper and lit it. In about a minute I heard another report in the cabin, 'It's a steamer; she is coming right for us.' The torchlight would only burn two or three seconds. The mate asked me to light the torch again. I said, 'I have no time; the cook will do it.' I jumped on deck and got on the cabin top. I watched the lights for a few seconds. When I first saw them they were about half a mile off, probably less. I watched till the lights got pretty close to and the green light almost shut in. At this time I could see the port side of the hull, a kind of glance of it. The boat seemed to come in that style till within about four times her length of us, and then she straightened up and came towards us. I asked the man at the wheel how our vessel was heading. He said she was on her course. The propeller seemed to starboard her wheel suddenly, when she was perhaps one hundred feet or more from us. I then ordered our wheel hard aport, hard up. The propeller struck us. The collision took place in two or three minutes after I got on deck; I can't tell well about the time. It was not more than five or six minutes after the first report of 'Light ahead.'"

The COOK, who was also steward, one Clements, gave his account of what part of things fell under his observation, as follows:

"At the time of the collision I was on deck. Before that I had been below. I heard the lookout report light ahead. The

mate answered, 'All right,' or something to that effect. Then I heard the mate report to the captain that the light did not appear to alter its course. The mate was standing on deck looking down in the cabin. Then the captain got up and looked out of the companion-way, and told the mate to light the torch-light. I got the matches to light the torch, and gave them to the captain. He lit the torch. Then the mate swung it under the leeside of the boom. Then, while he was swinging the light I looked up the scuttle to see if I could see the propeller-light myself. I did see a bright light. It was right ahead; might be half a point on the weather bow. Then I heard the captain say, 'Light the torchlight again,' and I went to the cabin and gave some matches again to the captain and he lit the torch. The mate showed the torch lighted at the same place as before. Then I went to look up through my scuttle again, and I could make out the whole three lights of the propeller bearing right down upon us. I could then just begin to see the hull loom up. In hazy weather like that, I cannot give any estimate of distance. I see the captain then jump atop of the house and hail the propeller. He sung out two or three times, but what words he said I cannot say. Then the vessels came together."

There was no lack of testimony on the other side.

It tended to show, and some of it positively enough, that the first light which the steamer saw on the schooner was the torchlight, dead ahead, or, if anything, a quarter or half point on her port bow; that this light was seen *eight or ten minutes before the collision;* that in a short time afterwards the green light of the schooner was seen, dead ahead, or, if anything, on the propeller's *starboard* bow; this, of course, indicating that the schooner was passing to the starboard, so that the vessels would pass starboard to starboard— "green to green;" that the second torchlight was then seen, and still the green light alone, opening on the propeller's starboard bow, from dead ahead to one or two points on that bow. So that whatever might be thought about "leeway," there was still no danger, nor appearance of danger; that after the green light had been thus opened until it was about a point and a half or two points on the propeller's

starboard bow the green light suddenly became invisible, and the red one shot in sight a minute or two before the collision, and appearing about one and a half or two points off the propeller's starboard bow, appearing as soon as the green one became invisible; that the schooner was estimated by those on the propeller to be then from an eighth to a half of a mile on the propeller's starboard bow; that they conceived that this indicated that the schooner had changed her course and was crossing the propeller's bow; that the propeller then put her wheel hard astarboard, stopped and backed her engine.

All this part of the case was made out by the statements of witnesses who, as to exact times and distances, were in opposition to the witnesses of the other side, and were in certain particulars not absolutely consistent with each other.

So at least the District Court thought, and it therefore decreed for the libellants, condemning the Wenona for the loss of the schooner and her cargo.

The Circuit Court, on a more favorable view of the evidence of the respondent, reversed that decree, and the owners of the schooner brought the case here to re-establish, if they could, the decree of the District Court.

There was no denial that the propeller was well officered, with a good watch, &c., &c.; the chief allegation being that they had wholly mistaken distances, and so committed fault.

*Mr. J. Ganson, for the appellant:*

The mate and wheelsman testify positively that the schooner did keep her course until the propeller was coming on her, and was only a short distance off, when her wheel was put hard aport under the captain's order, to ease the anticipated blow. The respondent offers no evidence of a positive character in opposition to this affirmative testimony. His evidence conveys *opinions* rather than facts, in opposition to the positive evidence on the part of the libellant. That kind of evidence cannot weigh against positive proof.

The burden is on the propeller to show that it did everything in its power to keep out of the way of the schooner.

This it had a right to do, as it was in the open lake, by either porting or starboarding its wheel, or by slackening its speed, or by stopping and reversing its engine, if there was risk of a collision. If a steamer makes the light of a sailing vessel at a sufficient distance to avoid coming in contact with the vessel, and a collision ensues, *primâ facie* the steamer is chargeable with fault, and the steamer must exculpate itself by clear and satisfactory evidence, or she will be held liable.*

If the approach of the vessel is such "as to involve the risk of a collision," and such risk *is ascertained*, then the measures "to keep out of the way" are to be taken. If doubt exists in the case of a steamer as to the proper course to be taken when nearing a sailing vessel, arising from difficulty in determining the course of the sailing vessel, then the steamer should "slacken her speed, or, if necessary, stop and reverse."†

The evidence on the part of the libellant shows great care, caution, and attention. The mate and captain of the schooner, seeing that the propeller was steering directly for the schooner, so as to involve risk of a collision, ordered a torch lighted to attract the attention of the propeller and warn it of the danger. The first light from the torch did not apparently attract the attention of the propeller, for it continued to bear for the schooner. A second flash-light from the torch was made. The man at the wheel was cautioned at the same time to keep the schooner steady on her course. He testifies that he did so. This shows that the persons in command of the schooner were on the alert, and taking unusual pains to warn the propeller of the danger.

There is not any dispute as to the fact that the propeller starboarded its helm, but the libellant's and respondent's witnesses differ considerably as to the then relative position

---

* The Carroll, 8 Wallace, 302, 304.

† 13 Stat. at Large, 61, art. 16; The Cleopatra, Swabey, 135; Lowndes on Collisions, 27; Holt's Rule of the Road, 200, The Joseph Straker *v.* The Karla.

of the two vessels, and as to the distance there was then between them.

The libellant's witnesses testify that when the second torchlight went out the vessels were very near each other. It was at this time the libellant himself stepped on top of the cabin. The vessels were then, as the libellant testifies, from one-quarter to half a mile apart.

The respondent's testimony would go to show that the propeller made the red light of the schooner after the second torchlight went out, and that when it made the red light the vessels were apart not less than a quarter of a mile, and that some little time elapsed between the disappearance of the second torchlight and the appearance of the red light of the schooner.

It is evident that the distance between the two vessels when the propeller put her helm hard astarboard and swung to port was about as the libellant's witnesses state, and not so great as that given by the respondent's witnesses.

It is obvious that there was haste in the manœuvre of the propeller, and that before it was made the vessels were in a dangerous proximity. The blame rests with the propeller for getting the vessels into that position, and it must be held liable.*

It is evident that the propeller's headway was not materially checked when the vessels collided, and that the propeller was going ahead.

So far as the decision of this court as an appellate tribunal is concerned, it will, on the disputed evidence, give great weight to the decision of the District judge, who had the advantage of seeing the witnesses as they testified and could form a good judgment of their probity and intelligence.

*Mr. G. B. Hibbard, contra:*

To commit a *fault* is to violate some statute, some rule, some custom, and not merely to err.

---

* The Lucille, 15 Wallace, 676; Bentley v. Coyne, 4 Id. 512; The Carroll, 8 Id. 304; The Fairbanks, 9 Id. 420.

The propeller violated no law, rule, or custom. She conducted herself with ordinary care, skill, and judgment, under the then circumstances, and with reference to appearances which should then have guided her.

That she was well officered, that her watch was perfect, her master, second mate, wheelsman, lookout, and engineer at their places, is not denied. That they were each and all competent is not questioned. That they saw the schooner about one and a half or two miles off is shown. That they continued vigilantly to watch the schooner, doing nothing else from that time to the collision, each devoting himself to the performance of his duty, is not to be doubted. Is it to be determined that such abundantly competent men, properly placed, altogether vigilant, occupying places for the proper exercise of judgment infinitely better than any other, are in fault; and that the damages for such a loss as this should fall upon the propeller, when fault, as will be shown, was committed by the other vessel?

Seeing the green light dead ahead, as it is plain that the propeller did see it, and no other light, what was the rule? " Starboard the helm." Seeing the green light on the starboard bow, what again was the rule? " Starboard the helm."*

The very doggerel states it:

> " Green to green, or red to red,
> Perfect safety. Go ahead."

Why, during the time that the green light continued to be seen, should the propeller have done any more than continue to open it on her starboard bow?

When the light of this schooner could be and was seen about two miles (the statutory distance at which they should be visible) there was no fault to be found with the speed of the propeller. There was every opportunity for avoiding a collision necessary in such a case. When vessels are seen

---

* American Rule of the Road, 127, 228.

that distance apart the absence of a lookout even is not considered a fault.*

Without fault down to the time the green light continued to be solely visible off the propeller's starboard bow, the propeller cannot be in fault at all, unless she afterwards committed it; and committed it when, having thus seen the green light opening on her starboard bow, she had a right to conclude that the vessels were going clear of each other.

The propeller had kept swinging steadily to port. She did not put her wheel aport. Down to the period of the propeller's progress so far considered *not one indication of danger*. At this time, and when the green light had opened until it was about one point and a half or two points on the propeller's starboard bow, the green light suddenly became invisible and the red was seen. Estimates of time and distance, in collision cases, are of course uncertain, but this red light is estimated by those on board the propeller to have been visible a minute or two before the collision. The red light first appeared about one and a half or two points off the propeller's starboard bow, appearing as soon as the green light became invisible. The schooner was estimated by those on the propeller to be then from an eighth to half a mile off, on the propeller's starboard bow, and, as has been seen, from one and a half to two points off the starboard bow. The schooner was seen running in a direction to cross the propeller's course, with her sails full, well before the wind. When this red light was seen thus alone on the starboard bow, it at once indicated that the schooner had changed her course and was crossing the bows of the propeller. The propeller was then swinging to port under her starboard wheel. The schooner had suddenly changed her course, but was still off the starboard of the propeller. What should the propeller do in this sudden emergency, this sudden change from safety to peril, produced by the fault of the schooner? Precisely what she did do: put her wheel hard astarboard, and, as was done, stop and back her engine.

---

* The Maria Martin, 12 Wallace, 31, 42; The Fannie, 11 Id. 238.

Should the propeller then have put her wheel aport, when she was swinging to port at the time, when she would have had to overcome that swing before her port wheel would be felt?

Suppose the propeller, under the circumstances of sudden peril produced by the fault of the schooner, then committed an error (which she did not do), yet she was not responsible under familiar rule.

The conduct of the propeller was faultless, upon authority. A steam vessel is required to take no precautions when there is no apparent danger.*

The schooner was in fault; she caused the collision. The proof given by the propeller as to the opening of the schooner's green light, and the suddenly exhibited red, shows that the wheelsman of the schooner *must* have changed her course before her master gave the order to put her wheel hard up. It may have been done without his knowledge. It may have been done without the knowledge of any one except the wheelsman. It is true the wheelsman asserts he did not do it, as is always the case in collision causes. But both he and the captain, and others on the schooner, *swear to things absolutely, which could not have existed had not this change taken place.*

Mr. Justice CLIFFORD delivered the opinion of the court.

Sailing vessels, when approaching a steamer, are required to keep their course, and steamers, under such circumstances, are required to keep out of the way. Vessels propelled by sails are required to keep their course on account of the correlative duty imposed upon the steamer to keep out of the way, in order that the steamer may know the position of the object to be avoided and may not be led into error in her endeavor to comply with the requirement. Under the rule that the steamer must keep out of the way she must of necessity determine for herself, independently of the sailing vessel, whether it is safer to go to the right or

---

* The Potomac, 8 Wallace, 590; The Scotia, 14 Id. 170, 181.

to the left or to stop, and in order that she may not be deprived of the means of determining the matter wisely, and that she may not be defeated or baffled in the attempt to perform her duty in the emergency, it is required by the rules of navigation that the sailing vessel shall keep her course and allow the steamer to pass either on the right or left, or to adopt such measures of precaution as she may deem best suited to enable her to perform her duty and fulfil the requirement of the law to keep out of the way. Rules of navigation, such as have been mentioned, are obligatory upon such vessels, when approaching each other, from the time the necessity for precaution begins, and they continue to be applicable as the vessels advance, so long as the means and opportunity to avoid the danger remain. They do not apply to a vessel required to keep her course after the approach is so near that the collision is inevitable, and are equally inapplicable to vessels of every description while they are yet so distant from each other that measures of precaution have not become necessary to avoid a collision.*

Injuries of a serious character were received by the schooner Frémont, owned by the libellant, on the twenty-ninth of November, 1869, in a collision which occurred on Lake Erie, about nine o'clock in the evening of that day, between the schooner and the propeller Wenona, in consequence of which the schooner sunk in the middle of the lake, and, with her cargo of salt, became a total loss. Damages were awarded to the libellant, as the owner of the schooner, by the decree of the District Court, in the sum of thirteen thousand nine hundred and seventy-nine dollars and fifty-two cents, and costs of suit, from which decree the respondents appealed to the Circuit Court, where the parties were again heard, and the Circuit Court reversed the decree of the District Court and entered a decree dismissing the libel, holding that the collision occurred solely through the fault of the schooner. Whereupon the libellant appealed to this court.

---

* Mail Steamship Co. v. Rumball, 21 Howard, 384; 13 Stat. at Large, 60, 61

. Briefly stated, the facts of the case, as they appear to the court here, were substantially as follows: Bound on a voyage from the port of Oswego to the port of Sandusky, the schooner, just before the collision, was proceeding up the lake, heading southwest by west half west, and moving about five or six miles an hour. On the other hand, it appears that the propeller was bound on a voyage from Chicago to Buffalo, and was proceeding down the lake ten miles an hour, heading east by north half north. They were, therefore, sailing in nearly opposite directions, there being only a single point of variance, and the leeway which the schooner was making, as appears by the evidence, made the lines of their actual progress more nearly parallel. None of these facts are much disputed, and it is quite certain that the wind was south or south by east, and that the schooner, though making some leeway, was nearly closehauled. It was raining, and the night was somewhat dark, but the witnesses agree that there was no fog and not much mist on the water. Both vessels were seaworthy and well manned, and the evidence furnishes no reason to doubt that they both had good and sufficient lookouts properly stationed. Both vessels also showed signal lights, but it is insisted by the respondents that the signal lights of the schooner were not properly located on the vessel. Much discussion upon that subject, however, is unnecessary, as it clearly appears that the lights were burning brightly, and that they were seen by the propeller in ample season to have enabled her to adopt any and every proper precaution to have avoided a collision.

Two faults are ascribed to the schooner by the respondents, as follows: (1.) That she did not have good signal lights properly displayed, as required by law. (2.) That she changed her course, in violation of the fifteenth rule of navigation for preventing collisions on the water.

1. Enough has already been remarked to show that the first defence is not supported, without further discussion, and it is accordingly overruled.

2. More difficulty arises in disposing of the second, as

there is considerable conflict in the testimony upon that subject, which, doubtless, led to the difference of opinion between the District and Circuit Courts. Where there is no material conflict in the testimony of the witnesses, it is seldom difficult to decide such a controversy, as the rules of navigation are very plain and may be readily applied without much danger of mistake.

Errors committed at the moment of collision are to be regarded with less strictness than those committed when the vessels are more distant from each other, as such an error is often superinduced by an error of the other vessel committed at an earlier moment. In such a case much depends upon time and distance, as all experience shows that measures of precaution, in order to be effectual, must be seasonable, and it is well-settled law that if they are not so and a collision ensues in consequence of the delay, it is no valid defence on the part of the delinquent vessel to aver that nothing could be done at the moment to prevent the disaster. Inability to prevent a collision usually exists at the time it occurs, and in order to determine where the fault lies it usually becomes necessary to examine with care the conduct and orders of those in charge of the respective vessels from the time the vessels came in sight of each other to the time they came together, and such an examination frequently discloses the fact that the cause of the collision is to be found in some negligence or mismanagement of one or both vessels when they were at some distance from the theatre of the actual collision.* Difference of opinion as to the true state of the facts doubtless led to the contrariety of decision in the lower courts, and it is the same difference of opinion between the parties which makes each claim with confidence the favorable decision of this court. All agree that it was the duty of the propeller to adopt the necessary precautions to keep out of the way, and the respondents insist that they complied with that requirement, but the libellant denies that proposition and contends that they did not adopt any pre-

* The Merrimac, 14 Wallace, 203.

cautionary measure for that purpose in season to render it effectual. Perfect concurrence of views is also entertained by the parties that it was the duty of the schooner to keep her course, but the respondents contend that the schooner violated that requirement, and that the charge made in argument against the propeller, that she did not adopt proper and seasonable precautions, is not supported by the evidence. Evidently, therefore, the decision of the court must turn upon the view taken of the evidence. Such being the state of the case the court has looked carefully into the evidence and is of the opinion, after a deliberate consideration of the same, that the theory of fact assumed by the libellant is correct.

Proper signal lights were displayed by the schooner, and in addition to that requirement it appears that the mate, when the two vessels were a mile and a half apart, exhibited a torchlight. Report was first made to him by the lookout that he, the lookout, saw a bright light ahead, but presently he saw both a red and green light, and thereupon reported to the mate that there was a steamer ahead, and he testifies that the mate immediately lighted the torch. He states that he watched the approaching lights and that they appeared to be nearly ahead, gaining a little to the windward, until they opened out " to our port bow," which was their weather bow; and continuing the narrative he says that the next thing that he saw was the propeller seemed to be coming down on to the schooner, when he called to the men below to come on deck and look out for themselves. He went on duty at eight o'clock, and he states that just after that, the schooner was put upon a course of southwest by west half west, that she had been on that course a half hour or more before the collision, and that she was kept on that course to the time it was changed by the master, which was after the master came on deck, just before the propeller struck the schooner.* No one could have better means of

---

* As the Reporter read the record it was the mate, not the lookout, who testified to this last fact (see *supra*, 43). This difference is, however, unimportant.—REP.

knowledge than the lookout enjoyed, as he was on the deck when the propeller was first discovered and continued there until the collision occurred, and he testifies in the most posi-tive terms that he knows what the compass course of the schooner was, and that it was not changed before the order was given by the master, as before stated, and that he heard the order when it was given by the master to the wheels-man to make that change.

Equally positive testimony to the same effect is given by the man at the wheel, who testifies that no change was made in the helm of the schooner from the time she was put upon the course of southwest by west half west until the master sung out, put the helm up, when the schooner was not more than half her length from the propeller, that the propeller at that time was off the port bow of the schooner heading about midships of the latter vessel; and he adds, with em-phasis, that "no other change was made in the course of our vessel from the time the white light was reported down to the collision."

Until just prior to the colllsion the master was in the cabin, which was on deck, but he heard the report of the lookout to the mate that there was a light ahead, and heard the order of the mate to the man at the wheel to keep the vessel steady and not to let her fall off. He lighted the first torch for the mate, but when he heard the lookout say it is a steamer coming right towards the schooner, he, the master, jumped on deck and got on the cabin roof, where he could see the approaching lights about a half point on the weather bow and probably one-fourth of a mile distant. Inquiry was made by him of the man at the wheel how the schooner was heading, and he replied that she was on her course, and the master testifies that at one time as he stood on the cabin watching the lights of the propeller he caught a glance of the port side of her hull, and he states that she seemed to advance in that way until she came within about a hundred feet of the schooner, when she suddenly changed her course, and that when he saw that change he gave the order to the wheelsman to put the helm hard up. Such a

change cannot be regarded as a culpable act, as it is clear that the collision was then inevitable, and it is highly probable that if it had not been given the destruction of the schooner would have been so sudden as to have prevented the master and crew from escaping from the wreck.

Clements, the cook and steward, was also examined, and his testimony accords in all substantial respects with the other witnesses called by the libellant.

Witnesses, it is true, were examined by the respondents, whose accounts of the circumstances preceding the collision differ in many respects from the statements made by the witnesses of the libellant, but their testimony is not of a character to warrant the court to impute wilful false-swearing to the witnesses who were on the deck of the schooner, and the court is of the opinion that it is scarcely possible to adopt the theory of the respondents without coming to the conclusion that the libellant's witnesses have committed wilful perjury.

Several theories are suggested which it is argued show that it is highly improbable that the collision would have occurred if the schooner had kept her course, as the libellant insists she did, but it is clear that the schooner was sunk by a blow from the propeller, and in the opinion of the court the evidence to show that the schooner did keep her course until the collision was inevitable is too strong to be overcome by any or all of the theories suggested in argument by the respondents. Most of the theories suggested by the respondents as tending to show that the schooner did not keep her course, as assumed by the libellant, are based upon the estimates of time and distance made by the witnesses who were on board the propeller, which, in the judgment of the court, are far too liberal and quite unreliable; as, if admitted to their full extent, they would show that the collision could not have occurred. Doubtless the helm of the propeller was put to starboard when the first torchlight was displayed on the schooner, but it is highly probable that the two vessels were much nearer together than is supposed by the witnesses, as it is evident if they

were two miles apart at that time and much change was made in her wheel, that the collision would have been avoided unless a counterchange was made in the wheel before the distance between the two vessels was overcome. Carefully examined, it will be seen that the testimony of the respondents does not show that the schooner changed her course but once after her signal-lights were first seen, and that change is admitted by the witnesses of the libellant. But they differ widely in one respect from the respondent's witnesses, as the latter assume that the collision would have been avoided if that change of course had not been made, whereas the libellant's witnesses testify to the effect that it was not made until the collision was inevitable, and the court is of the opinion that the latter theory is satisfactorily proved. Inferences from circumstantial facts may frequently amount to full proof of a given theory, and may even be strong enough to overcome the force and effect of direct testimony to the contrary, but the circumstances invoked in argument by the respondents in this case are not sufficiently persuasive and convincing to justify the court in adopting a conclusion directly opposed to the positive testimony of all the witnesses who were on the deck of the schooner just before and at the time the disaster occurred. Beyond doubt they must know what the circumstances were, and the record furnishes no sufficient reason to warrant the court in imputing to them wilful falsehood.

DECREE OF THE CIRCUIT COURT REVERSED, and the cause remanded with directions to

AFFIRM THE DECREE OF THE DISTRICT COURT.