MUMFORD SMITH and others *vs.* ST. LOUIS MUTUAL LIFE INSURANCE COMPANY and others.

April Term, 1876.

REMOVAL OF CAUSES FROM THE STATE TO THE UNITED STATES COURT.—To entitle any one or more of the defendants to remove a cause from this court to the United States court, under the act of 3d of March, 1875, all of the material defendants must have the necessary citizenship.

CASE IN JUDGMENT.—Thus, where citizens of this state, holding policies of life insurance in a foreign corporation, filed their bill in this court against that corporation and other foreign corporations for relief, and to subject to the satisfaction of their claims the property of that corporation, and, among other property, certain state bonds deposited by it with the treasurer of the state "as security for risks taken by citizens of this state," and, for this purpose, made the treasurer, a citizen of this state, a party defendant, it was held that the treasurer was a material party defendant, and the court refused, upon the application of the foreign corporations to remove the cause, to accept the petition and bond of the applicants, and to authorize the removal.

*M. M. Brien, jr.*, for complainants.
*R. McP. Smith*, for defendants.

THE CHANCELLOR:—An application has been made in this case, by the defendant corporations, to remove the suit to the circuit court of the United States, at Nashville.

The complainants are holders of policies of life insurance, issued to each of them respectively, upon separate con-tracts, by the St. Louis Mutual Life Insurance Company. This company had, under and in compliance with a law of the state, deposited with the defendant William Morrow, as treasurer of the state and insurance commissioner, $20,000 in bonds of the state of Tennessee, "as security for risks

taken by citizens of this state." It also had, it seems, some property in this state, in the shape of realty and of money, in the hands of two agents, Ransom and Glasgow, who are made defendants. On the 11th of August, 1875, a part of the complainants filed their original bill against the St. Louis Mutual Life Insurance Company, the St. Louis Life Insurance Company, and William Morrow, treasurer of the state, alleging that they were holders of policies issued by the first named company ; that said company had undertaken to make some disposition of its assets, fraudulent and *ultra vires,* to the second named company, seeking to rescind the contracts of insurance on this and other grounds, and to impound, for the satisfaction of any recovery which might be had, the state bonds in the hands of Morrow, as aforesaid, " and some real estate in and around Nashville." On the 29th of October, 1875, an amended bill was filed, to bring before the court other policy-holders seeking the same relief, and, as additional defendants, the Mound City Life Insurance Company, James B. Eads, and others, named as officers and directors of said last named company, now, it is alleged, the St. Louis Life Insurance Company ; W. T. Lewis and others, named as officers and directors of the St. Louis Mutual Life Insurance Company ; Charles H. Peck and others named ; and W. T. Glasgow, agent of the St. Louis Life Insurance Company in this state. On the 25th of January, 1876, a third amended and supplemental bill was filed, adding new complainants, and, as defendants, the Life Association of America and William Ransom, the former as a fraudulent and *ultra vires* assignee of the assets of the St. Louis Mutual Life Insurance Company, and the latter as another agent of that company in this state. Under these various bills, attachments and injunctions were sued out to attach the property of the St. Louis Mutual Life Insurance Company, and impound the same in the hands of Morrow, Glasgow, and Ransom, to be held subject to the final decree. All of the complainants in these several bills are citizens of this state, and all of the

42

defendants are non-residents of this state, except Morrow, Glasgow, and Ransom. The St. Louis Mutual Life Insurance Company and the St. Louis Life Insurance Company appeared and filed an answer to the original bill, and, after the last amended and supplemental bill, these companies and the Life Association of America appeared and put in a demurrer. The present application is made by the St. Louis Mutual Life Insurance Company, the St. Louis Life Insurance Company, " now styled the Columbia Life Insurance Company," and the Life Association of America. The application is to remove the entire suit to the circuit court of the United States for the district of Middle Tennessee, at Nashville, under the act of Congress of the 3d of March, 1875. The petition is in due·form, and the bond offered unexceptionable. The only question, therefore, is whether the applicants are entitled to have their petition and bond accepted, or to an order from this court for the removal of the suit, as prayed.

There are some decisions of the circuit and district judges of the United States to the effect that the filing of a sufficient petition and bond in the state court *ipso facto* transfers the cause to the federal court, and that no action on the part of the state court is required or permissible. I cannot concur in these rulings. It is undoubtedly true that, if a proper case for removal is made out, and the petition and bond are in conformity with the requirements of the law, it is the duty of the state court to accept the petition and bond, and to make the necessary order of removal; and any step taken thereafter in the cause by that court would be clearly erroneous, and subject to reversal for that reason alone, either by the appellate state court or by the Supreme Court of the United States. *Gordon* v. *Longest*, 16 Pet. 97; *Kanouse* v. *Martin*, 15 How. 198; *Insurance Co.* v. *Dunn*, 19 Wall. 214; *Gaines* v. *Fuentes*, 92 U. S. 10.

But it is equally true that, if a case be ordered by the state court improperly to be removed to the United States court, it is the duty of the latter to remand it. *Knapp*

v. *Railroad Co.*, 20 Wall. 117. And it is also true that, although the application to remove be made in due form, and the bond offered be unexceptionable, the state court may, in a proper case, refuse to accept the petition and bond, or to order a removal, and will continue to have exclusive jurisdiction of the cause. *Case of the Sewing Machines*, 18 Wall. 553; *Vannevar* v. *Bryant*, 13 Wall. 41; *Ex parte Turner*, 3 Wall. jr. 258. In either case the ultimate decision of the question of jurisdiction rests with the courts of the United States. Each court must, however, in the first instance decide for itself whether it will proceed, subject to the revising power of the Supreme Court of the United States, and the only way in which unseemly conflicts of jurisdiction can be avoided is by leaving the jurisdiction in the state court until it has formally parted with it by accepting the petition and bond, or making the necessary order. This is the course clearly indicated by the present chief justice of the United States, in *Railway Co.* v. *Ramsey*, 22 Wall. 328. "To obtain the transfer of a suit," he says, "the party desiring it must file in the state court a petition therefor, and tender the required security. Such a petition must state facts sufficient to entitle him to have the transfer made. This cannot be done without showing that the circuit court would have jurisdiction of the suit when transferred. The one necessarily includes the other. *If, upon the hearing of the petition, it is sustained by the proof*, the state court can proceed no further. It has no discretion, and is compelled to permit the transfer to be made. The petitioning party is then required to file in the circuit court copies of the process, and of all pleadings, depositions, testimony, and other proceedings in the state court. *This includes the proceedings by which the transfer was effected*, and these, as has been seen, must show the facts necessary to give the circuit court jurisdiction." This language unquestionably recognizes, not merely the propriety, but the necessity, of the action of the state court upon the application. And the correctness of the action of the

state court adverse to the application was recognized in the *Case of the Sewing Machines*, 18. Wall. 553, and in *Vannevar* v. *Bryant*, 19 Wall. 41. These decisions were made upon the statutes previous to the passage of the act of the 3d of March, 1875, but upon provisions and language brought forward into that act in substance, and generally in the same words. When read together, it will be seen that the mode prescribed for the removal by the 12th section of the judiciary act is substantially identical with the mode prescribed by the act of 1875. In both, the applicant must file his petition, and offer good and sufficient surety for the same purpose, with the addition, made by the later act, of a provision for the payment of costs if the federal court shall hold that the suit was improperly removed, an addition not in the least affecting the application or the proceedings on it. By the act of 1789, when the petition is filed, and good and sufficient surety' offered, it is made the duty of the state court " to accept the surety, and proceed no further in the cause." By the act of 1875, when the petition and bond, with good and sufficient surety, are filed, it is made the duty of the state court " to accept said petition and bond, and proceed no further in such suit." The two provisions, so far as they imply positive action by the state court, are substantially the same, the implication being certainly not weakened by the requirement of the later act, that the state court shall accept the " petition " as well as the surety. Nor is there anything in the suggestion that there has been a change in the time when the petition may be filed, because of the words of the act of 1875 authorizing the filing " before or at the term at which said cause could be first tried." The argument is that these words authorize the filing of the petition in vacation, and *therefore* the action of the state court was not necessary. But the act of 1789 authorized the petition to be filed by the applicant " at the time of entering his appearance in such state court," and this might be in vacation as well as in term time. *Fell* v. *Christ College*, 2 Bro. C. C. 279 ; *Bowhee* v.

*Grills*, 1 Dick. 38 ; *Sweeny* v. *Coffin*, 1 Dill. 75. Besides, the words thus used in the act of 1875 were merely intended to make certain the right of the applicant to file his petition at any time before the trial term, which he might do at the appearance term, or even earlier, and " at the time of enter- ing his appearance in such state court." There is nothing in the difference in the wording of the two acts to create a substantial distinction between them. The duty of the state court, and its rights, if it have any rights, are, identically the same under both acts.

The language of each of these acts fairly implies positive action on the part of the state court in accepting the peti- tion and surety, and concedes the continuance of its juris- diction until a copy of the record is " entered as aforesaid in said circuit court of the United States   *   *.   *   on the first day of its then next session." There cannot be a doubt that the state court would have jurisdiction to proceed with the cause after an application to remove, if, in fact, the application itself, or the case made by it, were insufficient to justify the transfer, or if the transfer were not perfected by filing the record in the circuit court at the time prescribed. The jurisdiction cannot be left, even for a moment, *in nubi- bus.* It must remain with the state court until the jurisdic- tion of the United States court attaches, and this cannot well take place until the former has formally parted with it by an acceptance of the petition and bond. This was the settled practice under the act of 1789, recognized as proper by the Supreme Court of the United States, in *Railway Co.* v. *Ramsey*, 22 Wall. 328, before quoted. This rul- ing is eminently satisfactory. Any other course would lead to confusion and unseemly conflict, without the least necessity. The state courts are as much bound by the pro- visions of the constitution of the United States, and the laws passed by congress in accordance therewith, as the federal courts, and are as little liable to err in the judicial construction of those laws as the inferior courts of the United States, and, if they do err, are subject to the same

mode for the correction of their errors in this regard. Useless expense and litigation may be incurred by an error of judgment in exercising jurisdiction improperly, but the same result would follow the improper exercise of jurisdiction by the federal court, and the error is as likely to occur in the one court as in the other. The evil is incident to the fallibility of human judgment, and the complicated nature of our judicial systems. The same evil attends the exercise of the separate jurisdictions of law and equity even in the courts of the United States, as litigants have found to their cost, after protracted litigation at law when the remedy was in equity, or *vice versa.*

The provision of the 7th section of the act of 1875, authorizing the circuit court of the United States to issue a. *certiorari* to the state court in a possible, though not probable, contingency, is obviously not enough to affect these conclusions. It may safely be said that there is no clear indication, in the act of 1875, that congress intended to interfere with the preëxisting practice, or to change the construction put by the courts on the language borrowed from the previous statutes; nor is there any sound reason for inferring such intention.

I am clearly of opinion, therefore, that it is my duty to act upon the application made, and to determine whether it presents a proper case for the removal of the suit to the circuit court of the United States, and that I have no right to avoid this duty by throwing the responsibility of the decision on the federal court. I would be glad to do so. For, as only one of these courts can legally proceed, an error of judgment can do neither party any good, and must necessarily lead to delay and expense.

Previous to the act of 1875, the law regulating the removal of causes from the state to the federal courts, on the ground of the citizenship of the parties, was well settled. The constitution of the United States, by art. 3, § 2, provides that the judicial power of the general government shall extend to " controversies between citizens of dif-

ferent states." But it has been uniformly held by the Supreme Court of the United States that the jurisdiction of the courts of the general government depended on the acts of congress, and not on the constitution, except as put in force by legislation. The famous judiciary act of 1789, by its 12th section, simply authorized a suit brought in a state court by a citizen of the state, against a citizen of another state, to be removed by the latter, on petition made at the time of entering his appearance. Under this act it was invariably held that a cause could not be removed unless all the material plaintiffs were citizens of the state in which the suit was brought, and all the material defendants citizens of some other state or states, and unless the application was made by all of the defendants. In other words, no removal could be had if any one of the material parties defendant was a citizen of the same state with the plaintiffs, nor, if the requisite citizenship of all the opposing litigants existed, unless all of the defendants concurred in the application. *Ex parte Girard,* 3 Wall. jr. 263; *Ward* v. *Arredondo,* 1 Paine, 410. The act of the 27th of July, 1866, undertook to allow one defendant, in certain cases, to remove the suit, where there could be " a final determination of the controversy, so far as concerned him, without the presence of the other defendants as parties in the cause," leaving the suit in the state courts as to the other defendants. The act of the 2d of March, 1867, gave a defendant against whom a suit was brought in the state court by a citizen of the state, and who was a citizen of another state, the right of removal upon affidavit that, from prejudice or local influence, he believed he would not be able to obtain justice in the state court. The act of 1866 in terms restricted the right of removal to cases in which there could be a final determination of the controversy, so far as concerned the applicant, without the presence of the other defendants. In *Gardner* v. *Brown,* 21 Wall. 36, the application for removal was under this statute. The bill was filed by the beneficiary, under a trust assignment of realty to secure his debt against

the grantor and trustee, to execute the trust. It was held that the grantor, although a citizen of a different state from the complainant, could not remove the cause to the federal court, the trustee being a citizen of the same state with the complainant, and this although the bill averred that the trustee had refused to execute the trust. A similar decision under the 12th section of the judiciary act had been made by our supreme court, in *Dunn* v. *Waggoner*, 3 Yerg. 59, the opinion having been delivered by Catron, C. J., afterwards an eminent member of the Supreme Court of the United States. It has been thought by distinguished judges that one defendant might, under the act of 1867, remove a suit as to all of the defendants, although some of the latter were citizens of the same state with the plaintiffs. But the Supreme Court decided otherwise, where the suit was *ex contractu*, in the *Case of the Sewing Machine Companies*, 18 Wall. 553, and where the action was in tort, in *Vannevar* v. *Bryant*, 21 Wall. 41. And, in *Knapp* v. *Railroad Co.*, 20 Wall. 124, Mr. Justice Davis says of the act that "it does not change the settled rule that determines who are to be regarded as the plaintiff and the defendant."

Under the foregoing statutory provisions, brought into the Revised Statutes, § 639, and the decisions construing them, the present application could not be sustained. The object of the bills is to reach the property of the St. Louis Mutual Life Insurance Company in the hands of Morrow as trustee, "and subject it, through the ordinary powers of a court of chancery, to the payment of the debt it was given to secure." This language of the chief justice, in *Gardner* v. *Brown*, is equally applicable here. The trustee is a citizen of the same state with the complainants, a state official, clothed with the legal title to the trust assets for the benefit of those concerned, and, as such, entitled to come into this court for the purpose of administering the trust. *Pennebaker* v. *Tomlinson*, 1 Tenn. Ch. 111. The defendants Glasgow and Ransom are, probably, merely nominal parties. *Wood* v. *Davis*, 18 How. 467. And the attachment of

property, and the injunctions sued out to impound property, offer no obstacle to the removal. It is the title and citizenship of Morrow which alone stand in the way, and they would be insuperable under the law as it existed previous to the act of 1875.

The argument is made, and ably pressed upon the court, that this act has worked a change in the preëxisting law, and that, under its provisions, one defendant may remove the entire suit into the federal court, although there may be material co-defendants citizens of the same state with the complainant. To sustain the position thus assumed it must be shown, first, that the act of congress confers the right; and, secondly, that the act is constitutional. And there are *dicta*, if not decisions, of some of the circuit or district judges of the United States which assert, or take for granted, one or both of these propositions. These learned judges have almost invariably assumed the truth of the maxim that it is the duty of a good judge to enlarge his jurisdiction. We have had evidences of this fact, not only in the construction put by them on the acts in question previous to the act of 1875, but in their construction of the provisions of the bankrupt law involving the jurisdiction of the state courts. The Supreme Court of the United States, however, occupying a loftier vantage ground, and taking in a wider field of vision, have not yielded in the same degree to the natural inclination to expand the jurisdiction of the federal court. My duty is to follow the decisions of this august tribunal, and, in the absence of positive rulings, to be guided by the principles which underlie those decisions, and the suggestions thrown out in making them.

The first section of the act of 1875 enlarges the original jurisdiction of the circuit court of the United States, and upon the matter now before us, using for this purpose the very words of the constitution, but disclosing no intention of requiring the courts to depart from the uniform construction put by them on similar language in the previous decisions. The second section, touching the subject under

consideration, enacts : " That any suit of a civil nature, at law or in equity, now pending or hereafter brought in any state court, where the matter in dispute exceeds, exclusive of costs, the sum or value of $500, * * * in which there shall be a controversy between citizens of different states, * * * either party may remove said suit into the circuit court of the United States for the proper district. And when, in any suit mentioned in this section, there shall be a controversy which is wholly between citizens of different states, and which can be fully determined as between them, then either one or more of the plaintiffs or defendants actually interested in such controversy may remove said suit into the circuit court of the United States for the proper district."

Looking at the general scope of this section, without critically scrutinizing its words, it would not seem to be intended to effect a radical change in the existing construction of statutes *in pari materia*. The privilege of removal is simply conceded to both the plaintiff and defendant, and the language of the enactment is more nearly in the words of the constitution. The first paragraph, if we lay no stress upon the use of the words suit and controversy, is, in substance, the 12th section of the judiciary act of 1789, except that either plaintiff or defendant, instead of the defendant alone, may remove. In that view the uniform construction of that section would clearly apply—namely, that the removal cannot be had unless all the material plaintiffs are citizens of one state or of certain states, and all the material defendants are citizens of different states from any one of the plaintiffs, nor unless all the material parties on one side apply for the removal. The meaning given to similar language by uniform judicial construction must prevail in the absence of anything to show a clear intention to work a change. The second paragraph contemplates only the removal of suits in which there is a controversy "wholly between citizens of different states, and which can be fully determined between them." At most, the meaning is that,

where the requisite citizenship exists, any one or more of the plaintiffs or defendants may apply for and obtain the removal. If the intention was to remove the entire suit as to all parties, *without regard to citizenship*, merely because there was in it a controversy between citizens of different states, at the instance of one of those parties, then the words, "which can be fully determined as between them," were worse than useless. These words fairly imply that the suit or controversy may be removed, as to them, whenever the controversy can be fully determined between them; but not otherwise. But this is precisely the provision of the act of 1866, which was construed in *Gardner* v. *Brown*. The act of 1866, it is true, went on to expressly provide that the removal, in the case provided for, should not prejudice the right to proceed in the state court as against the other parties. But it is obvious such a provision was supererogatory; for, if the right to remove was confined to the matter of controversy which could be wholly determined between the parties to the removal, the jurisdiction of the state court necessarily would remain undisturbed in all other respects. That jurisdiction can only be affected by plain words extending the judicial power of the general government, within the provision of the constitution, over the subject-matter and the parties. The absence, then, of a positive reservation, in the act of congress, of the right of the parties who do not join in the application to remove, and who are not carried out of the state court by the removal, to proceed in the state court cannot be material. The right to proceed follows of course, unless congress shall distinctly enact the contrary. It will be time enough to enquire into the power of congress to pass such an act of restriction when, in the language of Mr. Justice Clifford, "the words of the enactment are of a character to warrant the construction." *Case of the Sewing Machines*, 18 Wall. 587.

Stress is laid, in the argument submitted for the petitioners, upon the fact that the act of 1875 provides that when in any *suit* there is a *controversy* between citizens of different

states, either party may remove the *suit;* and it is insisted that such language plainly requires the removal of the whole suit as to all parties, without regard to citizenship. This construction ignores the words, "which can be fully determined between them," already commented on. The right of removal is made to depend entirely upon this very fact—that the controversy may be fully determined between these citizens of different states, and why it should be so if the entire suit is to be removed it is difficult to understand. Besides, the act of 1867 used identically the same language—that where a *suit* is pending in which there is a *controversy* between, etc., the party may apply to remove the *suit.* And precisely the same argument now made was urged, and upon the same ground, in the *Case of the Sewing Machine Companies.* Mr. Justice Clifford, on this subject, says: "It is difficult to see in what particular the jurisdiction of the state court is lessened by the last act (of 1867), or in what respect the difference in phraseology supports the theory of the defendants, as 'a suit by a plaintiff against a defendant' must mean substantially the same thing, in the practical sense, as 'a suit in which there is a controversy between the parties,' as each provision includes the word suit, which applies to any proceeding in a court of justice in which the plaintiff pursues his remedy to recover a right or claim." The learned justice emphatically condemns the suggestion that one party, who may bring himself within the act of congress, shall carry with him against their will all other parties. "Nor does it (the act of 1867)," he says, " give any sanction whatever to the proposition that the resident defendants shall be compelled or permitted, under any circumstances, to go elsewhere to answer the suit." To the same effect is the language of Mr. Justice Davis, in *Knapp* v. *Railroad Co.,* 20 Wall. 117.

The argument relied on, pushed to its logical results, would enable a single non-resident party, either plaintiff or defendant, to remove from the state court into the federal court the administration of estates, the settlement of trust

assignments, creditors' bills, or any kind of case, however numerous the resident parties, in which he might have a controversy, and carry with him *in invitum* all the other parties. When it is considered how little the machinery of the judicial system of the United States is adapted for such an increase of its business, and how ruinously it would affect a large class of litigants to be compelled to attend those courts from remote distances; it is not to be supposed that congress would so extend the judicial power of its courts, even if it had the constitutional authority, without the clearest and most unequivocal declaration of intention to that effect. I can find no such intent in the act under consideration, and must decline to grant the application to remove.