## THE SIF. THE COLERAINE. THE NELLIE TRACY.

(District Court, E. D. New York. August 1, 1917.)

COLLISION ☜95(4)—STEAMSHIP AND MEETING TOW.

A collision in the Bay Ridge Channel at night between an outgoing steamship and barges in a meeting tow in which two barges were sunk and others injured *held*, on the evidence, due solely to the fault of steamship in continuing at too great speed after the presence of vessels ahead whose positions could not be made out was known, requiring careful navigation, and also in failing to have a competent lookout at the time. The facts that some of the barges did not carry forward lights as required by the rules or that the tow was on the wrong side of the narrow channel *held* not to have contributed to the collision.

In Admiralty. Suit for collision by Charles E. McWilliams against the steamer Sif and the tugs Coleraine and Nellie Tracy, Thomas Tracy, claimant, impleaded. Decree for libelants against the Sif.

Macklin, Brown & Purdy, of New York City, for George M. Morrell Co. and others, owners of the Grace & Edith, A. J. & J. J. McCollum, Inc., and others, owners of the J. J. McAllister, Peter Aldrich, and others, owners of the Mamie Aldrich.

Park & Mattison, of New York City, for John Wilson, owner of the Arthur H.

Foley & Martin, of New York City, for Charles E. McWilliams, owner of the Hudson, and for Thomas Tracy, owner of the Nellie Tracy.

William C. Foster, of New York City, for M. & J. Tracy, owners of the Kirby.

George V. A. McCloskey, of New York City, for tug Coleraine.

Haight, Sandford & Smith, of New York City, for the Sif.

CHATFIELD, District Judge. This action has been brought for injuries to the various barges of a tow coming up the Bay Ridge Channel on the evening of February 3, 1915, in a collision with the single-screw ocean-going steamer Sif. The Sif in turn brought into the case the tug Coleraine, which had the boats in tow, and the tug Nellie Tracy, which was present as a helper. The day had been snowy, and the Coleraine left St. George before 5 p. m., with six barges on two hawsers at least 250 feet long. The ebb tide was strong, and the captain decided to cross from Robbins Reef to the Bay Ridge Channel. In so doing the boats were carried down around the Owl's Head buoy, and then started up, along the shoal anchorage ground below Governors Island, on the west side of the deep water channel. No snow had fallen since the boats left St. George, but it had become dark when at about slack tide and opposite Sixtieth street the steamer Sif struck the boat Aldrich, running over her, cutting her sides in, and causing her to sink at once. The steamer continued into the next boat, the McAllister, sinking her, and shoving the other boats together so that they received injuries for which they filed libels which were consolidated in this action.

Before the tow rounded the Owl's Head buoy at the lower end of the Bay Ridge Channel a seventh boat had been brought from St. George by the tug Nellie Tracy and put at the right of the second tier of the tow.

The port hawser of the Coleraine ran to the Hudson and the starboard hawser to the McAllister. These barges were connected by breast lines. On the right or starboard side of the McAllister was the boat Mamie Aldrich, with a load of hard coal destined for the East River. This boat was longer than the others, and was fastened by breast lines and by a spring tow line to the McAllister. The captain of the Aldrich at some time on the trip up the bay lengthened out this spring line so that his boat could sag back and be drawn in at the bow closer to the McAllister. She was a Schuylkill model, and her bow could not be drawn in close to the barge alongside, without carrying the stern away at the same time.

In the second tier on the port side (with lines to the Hudson in front) was the barge Kirby. Back of the McAllister, and on the star-

board side of the Kirby, was the barge Grace & Edith. In the third tier, back of the Grace & Edith, was the barge Arthur H.

The hawser boats and the barges Kirby and Grace & Edith were destined for points up the North River, while the barges Aldrich and Arthur H. were to be taken out of the tow, at a convenient point, to go through the Buttermilk Channel. The Nellie Tracy helped with the towing while crossing the Bay between Robbins Reef Light and the southern limit of the anchorage ground below Governors Island.

A third tug, the Walter Tracy, started from St. George after the others with a barge destined for 43d street, South Brooklyn.

The tow was proceeding directly up the channel and apparently about 800 feet from the Brooklyn shore, as shown by the place where the sunken boats were found. Just before the collision, the tug Conway had gone ahead up the channel and met the Sif, starboard to starboard, although none of the witnesses upon the Sif remember passing this vessel. The Sif was on a general course down the channel, to the west of the middle. Her engines had been running at full speed for a period of five minutes. They then ran at half speed for three minutes, and after being reversed for two minutes, the boat still had momentum sufficient to send her through the two canal boats in the manner which has been described. While running at slow speed she covered from half to three-quarters of a mile, according to her own witnesses, in three minutes. She could not, therefore, have been moving as slowly as four miles an hour, as is estimated by the pilot. She passed the Coleraine sufficiently to starboard so that neither boat exchanged signals. The captain and pilot of the Sif observed the green light of the Coleraine with the towing lights, but were not certain whether the tow was alongside or behind. They did not notice that the Coleraine had three white lights, indicating a tow of more than 600 feet in length. The portion of the tow which affected the navigation of the Sif was less than 600 feet in length, however, allowing 85 feet for the Coleraine, 250 feet for the hawsers, and 110 feet for each tier of boats except for the single boat tailing on behind. The green light of the Coleraine bore about two points on the starboard bow of the Sif, and the captain and the pilot of the Sif made out with difficulty the white towing lights of the Coleraine. This furnishes some evidence as to the sufficiency of the lantern lights upon the barges. They are not to be condemned as insufficient if the towing lights of the tug were not plainly visible at that distance and under the conditions which existed.

At about this time, according to the witnesses on the Sif, a vessel showing a red light, with two white towing lights, was also observed further away and bearing off from the port bow of the Sif. Dark objects were then observed from two points on the port bow to four points on the starboard bow. As the Sif passed the Coleraine, the engines were reversed, which swung the bow to starboard, and the vessel swung around seven points so as to go nearly broadside into the Aldrich, which was being towed at a slight angle. The Aldrich and the McAllister sank 300 feet apart, while the Hudson and Kirby continued after the Coleraine, the breast lines between them and the other boats parting. The Arthur H. and the Grace & Edith were damaged,

but were freed from the sinking boats and remained fastened to the Lehigh and Wilkes-Barre boat, while the Nellie Tracy, which had blown an alarm and shouted to the captains of the barges, when the Sif made the turn directly toward the Aldrich, cast off its lines, and went around behind the Arthur H. coming up against its port side. Thus the Nellie Tracy with these three barges swung alongside the Sif, and, according to the witnesses upon the Sif, these barges had no lights in view. The witnesses upon the Sif testify that the Hudson and the Kirby, then proceeding up the river with the Coleraine, showed small white lights, and these witnesses identify these lights as the small lights which they had seen just before the collision on the dark objects which they then assumed constituted the tow.

The Sif testifies that it blew a one-whistle signal to the tug showing the red light and the two white towing lights, and that this signal was not answered. One of the captains of the barges, all of whom were compelled to flee for their lives, and who had barely time to climb upon the other scows, testifies that he heard a two-whistle signal exchanged with some boat, which appeared to be the Sif, then turning directly toward the Aldrich, and this signal corresponds to that testified to by the captain of the Conway above mentioned.

The Sif, after giving a one-whistle signal, which was heard by none of the other boats, ported her helm, with the evident idea of passing behind the Coleraine's tow, wherever that might be, and to the westward of the tug showing the red light.

The witnesses for the Sif, as well as the men upon all the barges, upon the Coleraine, and upon the Nellie Tracy, testify that another tug, headed across toward Brooklyn, some distance back of the Nellie Tracy, showing a red light, with a white towing light, and with low white lights to the west or behind the red light of this tug, was seen or was visible just before the Sif turned toward the Aldrich.

The testimony also shows that the Walter Tracy, having a light tow, and being able to go across the anchorage ground, had overtaken the Coleraine and passed just before the collision directly across the wake of the Coleraine's tow. The Walter Tracy's captain was in doubt whether to follow the Coleraine and pass under the stern of the Sif which he observed coming down, starboard to starboard, or to go across her bow and pass her port to port. When the Sif turned to starboard he went on across her bow. The Walter Tracy reached a point at the time of the collision where its captain thought it better to put his barge in at Fifty-Sixth street and then go to the assistance of the fleet, than to turn back to their rescue with the barge in tow. He did so, picked up the Kirby, and followed the Nellie Tracy with the other barges which were still afloat to the New Jersey flats, where the injured barges were beached.

It is evident that the Walter Tracy was the boat observed by the witnesses upon the Sif, showing the red light, when the Sif ported her helm and attempted to run behind the Coleraine's bow. The Sif quickly reached a point where she was dead ahead of the Nellie Tracy, and within such distance that the red light of the Tracy would come into view, and particularly so if the Tracy cast loose and swung around to avoid collision.

By this time the Walter Tracy had gotten across and her light could plainly be distinguished from that of the Nellie Tracy, and confusion between the two could no longer be made. The Sif had no lookout from the time the Coleraine was observed off the Sif's starboard bow until just before the collision, her lookout having gone below deck and left in his place a carpenter who could not talk English. This carpenter attempted to communicate something, but the captain and the pilot of the Sif were so busy trying to make out the location of the tow of the Coleraine that the presence of this man as lookout served no purpose. The bridge is a considerable distance from the bow of the Sif, and under the circumstances the absence of a lookout was reprehensible, although the lookout's presence might not have prevented the collision if he discerned nothing more than the captain and the Sandy Hook pilot were able to observe, even with their marine glasses. The City of Augusta, 80 Fed. 297, 25 C. C. A. 430.

It is unnecessary to go into the testimony of the various men upon the scows. They all corroborated each other with the exception of one man who testified that the Nellie Tracy was around at the stern of the Arthur H. during the voyage. This was manifestly impossible and contrary to the Sif's own testimony, while one of the other captains placed the Walter Tracy at a position much closer to the tow than it evidently occupied before crossing astern.

Two faults are charged by the Sif. The first is the alleged lack of sufficient lights upon the scows. The rule governing lights in marine waters requires a white light forward on the outside boat of each tier and a white light aft on the outside boats of the stern or last tier. These lights are to be of sufficient strength to be visible at a distance of at least five miles. There were apparently lights upon the barges in this tow. The bows and sterns of the barges were close together, and a light at the stern of one barge would give the same warning as a light upon the bow of the barge immediately following. In order to comply with the rule, however, there should have been lights at the forward end of the outside boats in the first tier. If the testimony showed that the lack of these two lights contributed in any way to the collision, it would be proper to find that the usual disregard for this rule as to the placing of lights should not be overlooked. The Wenona, 19 Wall. 41, 22 L. Ed. 52. But in the present case the difficulty with the Sif was in making out the lights of the boats at all, not in distinguishing which were which. The towing lights of the Nellie Tracy were seen but dimly. The lights of tow of the Walter Tracy were not seen at all at the outset, although she was but a short distance away, and conditions must have been bad as the Sandy Hook pilot, an experienced and honest man, could not see with sufficient clearness to know just what the situation was when half a mile away. Up to this time the Sif had been going with the engines at full speed. Both her captain and the pilot knew that there were tows requiring careful navigation, which, according to her own testimony, did not answer a one-whistle signal, and which in a very short time proved to be a part of the tow which the Sif had voluntarily undertaken to pass starboard to starboard without giving any signals at all.

Under these circumstances it was negligence to continue until so

close that reversing the engines for two minutes would not prevent cutting through two loaded barges. The New York, 175 U. S. 187, 20 Sup. Ct. 67, 44 L. Ed. 126. In this connection the absence of the lookout at this precise moment has some significance in that he might have signaled to reverse sooner than this appeared to be necessary to the pilot and captain.

The other fault alleged by the Sif is the presence of the Coleraine's tow on the wrong side of the channel. The Bay Ridge Channel is a narrow channel, requiring navigation to the right of the center. La Bretagne, 179 Fed. 286, 102 C. C. A. 651. If the presence of the tow on the wrong side of the channel had entered into the situation and had been in any way the proximate cause of the collision, the Coleraine would have been in fault. She evidently chose this side of the channel for her own purposes, but the Sif, when it went down this channel, passing boats starboard to starboard, accepted the actual position of the tow, and was bound to navigate accordingly.

The Nellie Tracy could not have shown her red light to the Sif unless the Nellie Tracy was improperly maintaining her position alongside the tow. The presence of the Coleraine's tow upon the wrong side of the channel, if coupled with the maintenance of a second towboat in such position as to show conflicting lights, would plainly be a sufficient ground of liability, if a boat were confused thereby. This was the evident conclusion of the captain and pilot of the Sif, to which they were led by their observation of the red light of the Walter Tracy, and their ultimate observation of the red light of the Nellie Tracy as she sought to get away from the scene of collision. The witnesses upon the Sif talk about a green light some distance ahead, which they identify as the light of the Coleraine, but Lune, the man who left his post as lookout, seems to have seen before leaving a green light in the position of the Nellie Tracy. He thus corroborates the witnesses of the tow, and it must be held upon the whole record that the Sif does not show sufficiently to justify a finding that the Nellie Tracy was showing a red light before the Sif reached a point where collision was imminent. Under either circumstance it was the Sif's duty to stop, to ascertain the conditions which were confronting her, and to avoid the danger, unless the positions of the boats became apparent and whistle signals were successful in initiating navigation which would evidently be safe.

There should be a decree for each of the various libelants, with a separate bill of costs to each party represented by a separate proctor. The petition for limitation of liability will be granted to the extent of relieving the Coleraine from liability, but without costs, as the petition seems unnecessary in advance of any finding of liability.