## THE ERASTUS CORNING.[1]

### PENNSYLVANIA R. Co. v. THE ERASTUS CORNING, etc.

*(District Court, S. D. New York.   October 28, 1885.)*

1. COLLISION—SCHOONER AT ANCHOR—ANCHOR LIGHT—RULE 10, § 4233.
   On the evidence, *held*, that the schooner F., which, while lying at anchor in the harbor of New Haven, was run down at night by the steamer C., was solely in fault for the collision in having no anchor light properly burning.
2. ANCHOR WATCH—USAGE—MARITIME DUTY.
   If vessels anchor in places where other vessels are not reasonably to be expected to pass, it is not the usage, and, as it seems, is not a maritime duty, to maintain an anchor watch.
3. SAME—PROXIMITY TO PASSING VESSELS—FLASH-LIGHT—REV. ST. § 4234.
   But near a narrow channel-way, where steamers are accustomed to pass, whenever the weather is thick and lights likely to be obscured, it seems that the neglect to maintain an anchor watch and to exhibit a torch-light to approaching steamers should be deemed a neglect of ordinary prudence as well as of the intention of section 4234 of the Revised Statutes.

In Admiralty.

*Wilcox, Adams & Macklin,* for libelants.

*Goodrich, Deady & Platt,* for claimants.

BROWN, J. The libelants' schooner Foam, while at anchor in the harbor of New Haven, at about half past 10 P. M., on June 25, 1884, was run into by the steam-propeller Erastus Corning, in coming out of the harbor, bound for New York. The place of the collision, as I find from the weight of evidence, was a little less than one-half of a nautical mile below the Long Dock light, and from one-half to two-thirds of the distance between that light and the Black buoy, and probably from 100 to 200 feet west of a line joining those points, in about nine feet of water at low tide. The buoy is near the western edge of the dug-out channel. The night was dark, and somewhat thick with rain or mist, but without fog.

Various points are raised in the defense; but the only one I find it necessary to consider is the allegation that the schooner displayed no light. The channel from the Sound up to New Haven light consists of a dug-out portion about 600 feet wide, and, upon the westerly side, a further margin of natural channel, having from seven to twelve feet of water, very irregular and variable both in breadth and depth. The

[1] Reported by R. D. & Edward G. Benedict, Esqs., of the New York bar.

schooner drew some seven or eight feet of water. The tide rises and falls an average of six feet; and the mud at the bottom is so soft that steamers can run through it to the depth of a foot. Where the Foam lay, the margin of available water to the west of the channel would appear from the chart to be some 500 or 600 feet at low tide. A quarter of a mile below, it is much less. Steamers drawing from nine to ten feet of water ply regularly between New Haven and New York, going in and out daily, by night and day. The usual anchorage ground for sailing vessels is either up near the Long dock, or further down, near where the Foam lay, between the dug-out channel and the margin of the natural channel.

The Foam was within the usual and proper anchorage ground; but the passage-way for steamers accustomed to go in and out was so narrow that the necessity and the duty of maintaining a good anchor light are manifest. The case is within the spirit, and apparently within the letter, of rule 10, § 4233 of the Revised Statutes, which requires vessels at anchor in roadsteads or *fair-ways* to exhibit a white light. The weight of evidence is clearly to the effect that at the time of the collision no light was visible. The officers and lookout of the steamer were watching carefully for lights as they proceeded downwards. They passed among and between several vessels nearer to the Long dock; but as they approached the Foam they saw no light, and nothing of her until within 100 or 200 feet, when the collision was inevitable. After the collision, the Corning, in backing out of the way, backed out of sight of the Foam to the Northwest, and was obliged to feel her way towards her again, no light being visible, though carefully looked for. That no light could be seen under such circumstances is satisfactory proof to me that there was no light at the time of the collision. *The Royal Arch*, 22 Fed. Rep. 457; *The State of Alabama*, 17 Fed. Rep. 847, 862. It is not necessary to inquire by what mistake of the captain of the schooner, or by what accident, the light failed at the time of the collision; or under what mistake the witnesses of the libelants testified, who stated that they saw the light burning in its place the next morning. On the latter point, much the larger number of witnesses testified that after the collision no light was burning.

The claimants further contend that the schooner was in fault for not maintaining an anchor watch, and also for not showing a flash-light as the steamer approached. In the case of *The Lizzie Henderson*, 20 Fed. Rep. 524, it was held by Judge LOCKE that a schooner lying at anchor in the channel-way in the harbor of Cedar Keys was bound to show a torch-light. If it is the duty of schooners at anchor to show a torch-light, the duty of maintaining an anchor watch necessarily follows. Both duties may, perhaps, be dependent upon the same circumstances, namely: whether the vessels are at anchor in places where other vessels are reasonably to be expected to pass. When not in such a situation it certainly is not the usage, and it is not, I think, a maritime duty, to maintain an anchor watch; and I

should have some hesitation in holding that it was the intention of congress, in requiring torch-lights to be exhibited under section 4234, to change the maritime usage in respect to an anchor watch, or that such a watch should be maintained for the mere purpose of exhibiting a torch in a situation where no steamer was reasonably to be looked for. The context in section 4234 refers to vessels that are *navigated;* and the cases cited are those of anchorage in places or very near channel-ways where steamers were to be expected. See *The Clara,* 13 Blatchf. 509; S. C. 102 U. S. 200; *The Sapphire,* 11 Wall. 170; *The Lydia,* 4 Ben. 523; *The Isaac Bell,* 9 Fed. Rep. 842, and cases there cited. In a narrow channel-way, like that of New Haven, and at such a distance from the usual place where steamers start, whenever the weather is thick and lights likely to be obscured, I am inclined to think that the neglect of an anchor watch, and of the exhibition of a torch-light to approaching steamers, should be deemed a neglect of ordinary prudence, as well as of the intention of the law. But it is not necessary to decide this point, as I have no doubt that the usual light failed which the schooner was undoubtedly bound to maintain.

I have carefully considered the course of the Corning, and cannot pronounce her in fault. She was moving under a single bell slowly, and her officers and men were watching carefully. Although she was a short distance to the westward of the dug-out channel, it was not more than was compatible with careful navigation upon a thick night, and in the absence of exact ranges. She was necessarily somewhat deflected from her usual course by the necessity of avoiding other vessels nearer to the dock. Had the Foam's light been visible, as required by law, I cannot doubt that it would have been seen, and that the Corning would have had no difficulty in avoiding her, and that the collision must be ascribed solely to the want of a proper anchor light burning.

The libel will therefore be dismissed, but, under the circumstances, without costs.