CONNOLLY et al. v. THE BRANDYWINE GRANITE CO. NO. 6.

(District Court, E. D. Pennsylvania.    April 6, 1901.)

Nos. 7, 10.

COLLISION—BARGE AND ANCHORED DREDGE—IMPROPER ANCHORAGE AND INSUFFICIENT LIGHTS.

A dredge lay anchored in the channel of the Schuylkill river, with her two scows abreast between her and the shore, the three occupying over 80 feet in width, when, during a foggy night, a barge in tow of a tug, coming up the river in line with the dredge, came in collision with it, and both were injured. The barge had no rudder, and her movements were controlled entirely by those of the tug, to which she was fastened by two lines. The dredge carried two lights, but they were not such as were required by the Philadelphia harbor regulations, nor so placed, being about 3 feet below the upper deck. She was also in violation of the spirit of such regulations, by lying in the channel with the two scows abreast of her. She had no watch, and gave no signals. She was directly in the path of the tug, and her lights were not seen by the latter, which, however, succeeded in escaping collision after the outline of the dredge was seen, but not in time to save the tow. *Held,* that as between the dredge and barge, the tug not being a party, the dredge was solely in fault for the collision.

In Admiralty. Cross libels for collision.

Frank P. Prichard, for the International.

Curtis Tilton and Andrew C. Gray, for the Brandywine Granite Co. No. 6.

J. B. McPHERSON, District Judge. Nicholas Connolly and Michael Connolly are the owners of the steam dredge International, which was in collision with the barge Brandywine Granite Co. No. 6 on the night of January 25, 1898; and these suits are cross libels between the barge and the dredge, each accusing the other of negligence and asserting her own innocence. At the time of the collision the barge was in tow of the tug Rambler, but as the tug has not been served with process in either suit, and is not before the court, the present inquiry will be confined to the respective liability of the dredge and the barge.

The collision took place in the Schuylkill river, under the following circumstances: The dredge was not employed upon any work at the time, and was taking advantage of her idleness to have some repairs made to the dipper. She was anchored by her four spuds

near the eastern bank of the river, facing down stream. Between her and the shore, the two scows that accompanied her were lying abreast. The dredge is 36 feet wide, and each scow is 25 feet wide, so that, except at low tide, when the innermost scow was upon the mud, the three vessels occupied more than 80 feet of the river, which at this point is not wide. The dredge was in at least 12 feet of water. Her length of hull is 112 feet, and her crane and dipper project 30 or 40 feet further. There is some dispute whether she was lying parallel with the bank, or at such an angle that her crane projected towards the center of the stream; but, in the view I take of the case, it is not necessary to decide this controversy. The dredge has two decks, about 8 or 9 feet apart, and between them, upon the night in question, a lantern was hung at the bow and at the stern, about 3 feet below the upper deck. There was no light above the deck, and the lanterns did not display a clear, uniform, and unbroken light, capable of being seen all around the horizon at a distance of at least one mile. There was no watchman on duty, and, although a fog shut down upon the river towards midnight, no signals were given.

The barge and tug left Christiana creek on the morning of January 25th, the barge carrying on deck a cargo of stone bound for Gray's Ferry Bridge, a point on the Schuylkill above where the dredge was lying. About 5 o'clock in the afternoon, the tow tied up at the mouth of the river because of a severe snow storm, and remained there until half past 11, when the snow ceased, and the captain of the tug believed that the weather was about to clear. Accordingly, he started up the river, being himself in charge of the wheel, having proper lights set, and having a lookout stationed on the bow of the tug, a few feet away from the wheel. One man was on the barge, and he was also on duty as a lookout. The barge was 105 feet long and 30 feet wide, flat-bottomed, with square corners to her bow and stern, and was drawing 7 feet of water. She was fastened to the tug by two lines, one from each bow corner, leading to a bitt at the stern of the tug. The barge had no rudder, and her direction could only be changed by changing the direction of the tug. The tide had recently turned when the tug and tow started, and was flowing up the river. As Penrose Ferry Bridge was reached, a heavy fog shut down, so that objects could not be seen more than a short distance away. The tug was on the eastern or starboard side of the river, where there was plenty of water for the barge and herself, the tug drawing only 6 feet 3 inches; and she proceeded cautiously at very slow speed, making frequent soundings to be sure that she continued to have sufficient water. There are no buoys in the river between the mouth and the spot where the dredge was lying. The tug also gave the proper fog signals, but, of course, as the dredge gave no signals at all, none was heard in reply. Either owing to the descent of the fog or to the improper position of the dredge's lanterns, her lights were not seen, and her presence was not otherwise known to the tug and barge until she appeared as a dark object not far away and directly in front. The tug changed her course immediately and succeeded in escaping, but the distance

was too short to permit the barge to be drawn past in safety, and the barge and dredge came into collision, some injury being done to each.

As I have already said, the tug is not a party to these suits, and I shall therefore refrain from expressing any opinion concerning her culpability, especially as a suit is pending in the district of Delaware between the dredge and the tug, in which their liability to each other will be determined. Between the dredge and the barge, however, I am required to determine the question of fault; and upon this point I am of opinion that the dredge was negligent, and that the barge was not to blame. The negligence of the dredge seems to me indisputable. She was violating the spirit, at least, of the following regulation of the harbor of Philadelphia:

"Vessels must not anchor at any place in the channel of the river Schuylkill, nor lie at any wharf in that river more than two abreast, without the permission of the harbor master."

She was certainly in the channel for vessels of light draft, and, although she was not lying at a wharf, she was taking up more of the navigable portion of the river than this regulation intended to allow any vessel to occupy. She was also violating the letter, as well as the spirit, of another regulation, which provides as follows:

"A vessel under 150 feet in length, when at anchor, shall carry forward, where it can best be seen, but at a height not exceeding 20 feet above the hull, a white light in a lantern, so constructed as to show a clear, uniform and unbroken light, visible all around the horizon at a distance of at least one mile."

The lanterns of the dredge did not obey this rule. The place where they were hung was not where they could best be seen, and neither light could have been visible, even in clear weather, at the distance of a mile. Whether, if the light had been properly placed, it could have been seen in time by the tug, in spite of the fog, it is impossible to decide. But the dredge should have obeyed the regulation, and then, if her light had been so obscured by the fog as not to be visible, she would not have been to blame. As matters stand, while one cannot be sure upon this point, I think the dredge ought to have shown clearly that her fault in this respect had no effect in producing the collision. And, finally, I think the dredge was negligent in not having a watchman on duty, and in not sounding fog signals, as required by the act of congress. It may very well be that the obligation to maintain a watchman upon duty and to sound signals in a fog is not always and everywhere obligatory upon a vessel at anchor; but I think, where a vessel is in a position such as the dredge occupied, in a narrow river, and in water deep enough to be used by vessels in light draft, she certainly had sufficient reason to anticipate some degree of danger, and ought to have taken every means in her power to provide against it. Vessels ascending the river had no reason to expect to find her where she was, and were under no unusual duty to look out for her. But as she was anchored in a river known to be used by vessels of light draft, and was lying in water navigable for such vessels, she was, I think, bound to recognize that there was reasonable danger of collision, and to take proper precaution.

· The barge, in my opinion, is without blame, because her movements were entirely under the control of the tug. There was no negligence in permitting herself to be fastened by the two bow lines. This is a usual method of towing, and, moreover, if she had been lashed to the tug, the piers of the bridges over the Schuylkill could not have been safely passed. The barge contributed nothing to the injurious result. She did not control the movements of the tug, nor direct her where to go, nor what to do. So far as appears, the exclusive right to control the voyage rested with the captain of the tug, and the barge was purely passive. She could not change her own course, but was dependent for guidance upon the movements of the tug.

The libel filed on behalf of the dredge is dismissed, with costs. In the suit brought by the barge, a decree may be entered in favor of the libelant.