### THE SANTIAGO.

### THE PHILADELPHIA.

(District Court, E. D. Pennsylvania. April 10, 1908.)

#### No. 2.

1. COLLISION—ANCHORED VESSELS—VIOLATION OF RULES AS TO LIGHTS.

   The provision of article 11 of the Inland Navigation Rules (Act June 7, 1897, c. 4, § 1, 30 Stat. 98 [U. S. Comp. St. 1901, p. 2879]), which requires a vessel of 150 feet or upwards in length when at anchor to carry two lights, one at the forward part and the other at or near the stern at a lower height, to indicate the length of the vessel and the direction in which she is pointing is of great importance and must be strictly observed, and, if violated, a loss caused by a collision resulting must be borne by the vessel so violating it.

2. SAME—SPEED ON ANCHORAGE GROUNDS AT NIGHT.

   A speed of four miles an hour, increased to perhaps six by the tide, *held* not excessive on the part of a steamer in an anchorage ground at night.

3. SAME—MOVING AND ANCHORED VESSELS—ANCHOR LIGHTS.

   A collision between a pilot boat and a barge 271 feet long anchored on the anchorage ground inside the Delaware Breakwater on a dark night *held* due solely to the fault of the barge whose stern anchor light had been blown out five minutes before, and had been taken by the anchor watch into the pilot house to be relighted, and not restored, the evidence also being conflicting as to whether her forward light was burning.

In Admiralty. Suit for collision.

N. Dubois Miller and H. Alan Dawson, for libelant.

John F. Lewis and Francis C. Adler, for respondent.

HOLLAND, District Judge. This libel is filed to recover damages for the total loss of the barge Santiago and her cargo, which occurred while she was lying at anchor inside of the Delaware Breakwater early on the morning of December 3, 1904, as a result of being run down by the pilot boat Philadelphia. The Santiago was built of wood in June 1901, and was comparatively new. She was 271 feet long over all, 46 feet 3 inches beam, with a draught of 20 feet when fully loaded. She had four masts, and was schooner rigged. On the after part of her main deck, about 20 feet forward of her stern, there was a two-story house, the lower one about 25 feet long, 15 feet wide, and 7 or 8 feet high, above which was another house about 11 feet wide by 20 feet long and 7 feet high, divided into the pilot house and men's quarters aft, and surrounded by a deck on the roof of the lower house, 2 or 3 feet wide, on all but the after end, where it was about 5 feet wide. On November 30, 1904, the Santiago, loaded with a cargo of coal, manned by a captain, an engineer who acted also as a mate, a cook, and three seamen (all Portuguese), left Newport News for Providence, R. I., and on the afternoon of December 2, 1904, on account of threatening weather, put into the Delaware Breakwater. She was being towed by the tug Cuba in company with two other barges, the Canton and the Mantanzas. She came to anchor at about 3:45 o'clock that afternoon to the westward of the south end of the Northern Breakwater, with the Cuba the north of her, the Canton north of the Cuba, and the Mantanzas about 600 feet to the eastward of the Santiago. There were a great many other vessels there, this being an anchorage ground. The barge was heading eastward. Neither moon nor stars were shining, and it was a very dark night. The sky was overcast, the wind blowing fresh from the northeast, with occasional sprinkles of rain. A vigilant anchor watch had been maintained, and two riding lights, one in the starboard rigging of the foremast about 25 feet above deck, and the other on a staff on the top of the cabin near the stern, were set and burning up to within five minutes of the accident, when the after light was blown out, and the watch had taken it to the pilot house to relight it. This was about 2:45 o'clock in the morning, and while so engaged the pilot boat Philadelphia collided with the barge on the starboard side abaft the spanker rigging and abreast of the forward end of the cabin. The force of the blow cut into the plank sheer below the water line, and she sank in about one hour.

The libel charges that the collision and damage were not due to any fault or neglect on the part of the libelant or those on board the Santiago, but were wholly due to the fault of those in charge of the Philadelphia (1) in that they had no proper lookout; (2) that they had no competent officer in charge; (3) that they entered the Breakwater at an improper speed without taking the precautions needful in navigating through a place of anchorage during the night; (4) in not avoiding and keeping clear of the Santiago, and in not stopping or reversing her engine in time to avoid a collision; (5) in not changing her helm and passing under the barge's stern; (6) in not taking ordinary precaution to avoid anchored vessels in a place and at a

time where they were in great number. All of these allegations are denied in the answer, wherein it is claimed the pilot boat (1) was in charge of competent officers; (2) that she entered the Breakwater at proper speed; (3) that as soon as the Santiago was and could be seen the engines of the Philadelphia were promptly stopped and reversed; (4) and her helm put hard astarboard in an effort to avoid the collision. The answer further avers that the collision was wholly due to the fault of those in charge of the Santiago in failing to exhibit proper anchor lights on the barge, as required by law, and in failing to have a proper anchor watch.

The evidence establishes to the satisfaction of the court that there was an anchor watch maintained until 2:45 a. m., about 5 or 10 minutes before the collision, at which time, however, there was nobody on the deck of the Santiago, and that the regulation anchor lights had been put up, one in the starboard rigging of the foremast, about 25 feet above deck, and another on the flag pole fastened at the end of the deckhouse. These lights were not in the best condition, and would blow out in heavy puffs of wind. The forward light had been protected by a piece of bagging at the bottom of it, placed there early in the evening. About five minutes before the collision Fidelis Mattis, who was on watch, discovered the light in the stern had blown out. It was reported to the captain who directed him to take it to the pilot house and relight it. While thus engaged the collision occurred. There was no watchman on the deck of the Santiago at the time, and the stern light was out, and at about the point where the light should have been is where the pilot boat came in contact with the barge. The evidence is as conflicting as is usual in these cases as to whether or not there was a light burning in the foreward part of the barge at the time of the accident. All of the pilots aboard the Philadelphia, to the extent of 10 or 11, swear positively there was no light at all on the barge either fore or aft. They all, however, agree that after the accident, when they were summoned to the sinking barge to take the crew off, there was then a light up on the starboard rigging of the foremast and a lantern on the top of the cabin aft. Disinterested witnesses on the boats anchored nearby testify that these anchor lights on the barge were burning brightly in the early part of the evening and as late as midnight, but no witness, outside of the captain and three of his men aboard the Santiago, testify that the light in the starboard rigging was burning at the time the collision occurred, and all of the pilots, to the number of 10 or 11, testify positively no light warned them of the existence of the barge either fore or aft, and that in the darkness it was impossible to see the Santiago at more than 50 feet away, when they were unable to prevent the collision, although every known effort was adopted to do so, the engines reversed, and the wheel put hard astarboard in order that they might pass under the barge's stern. The pilot boat was running at the rate of four miles an hour with the tide which was running two, making a speed of six miles an hour over the ground. At the time of the accident one man was on the lookout, who was standing forward on her deck with nothing to obstruct his view; the master was at the port side of the pilot house, an experienced

pilot at the starboard side, and an able seaman at the wheel. The barge was seen by the lookout as soon as it was possible to see her in the darkness without a light on her stern. She only came in view when the light of the pilot boat lit up her mast, and then she was immediately discovered by the man on watch. No reasonable precautionary regulation or requirement seems to have been neglected by those in charge of the pilot boat, and when we remember that on this anchor ground, upon this night, there were as many probably as 30 vessels, each with its regulation anchor lights here and there and all about the pilot boat as it entered the anchorage, it might easily be that a light was burning in the starboard fore rigging of the Santiago, but, being 271 feet long, that light would be no protection to the stern of the vessel as the pilot boat approached, and even if the light in the starboard fore rigging had been seen, the night was too dark to enable those in charge of the approaching vessel to know the direction of the barge's stern, and they had a right to expect to see a stern light on a vessel of her length, and the absence of this light at this critical moment, without any watch or other means of warning approaching vessels, was the cause of the collision, and the fault is that of the barge.

Article 11 of the pilot rules for inland waters provides:

"A vessel under one hundred and fifty feet in length when at anchor shall carry forward, where it can best be seen, but at a height not exceeding twenty feet above the hull, a white light, in a lantern so constructed, as to show a clear, uniform and unbroken light visible all around the horizon at a distance of a least one mile.

"A vessel of one hundred and fifty feet or upwards in length when at anchor shall carry in the forward part of the vessel, at a height of not less than twenty and not exceeding forty feet above the hull, one such light, and at or near the stern of the vessel, and at such a height that it shall not be less than fifteen feet lower than the forward light, another such light." Act June 7, 1897, c. 4, § 1, 30 Stat. 98 (U. S. Comp. St. 1901, p. 2879).

These rules require that where a vessel is of 150 feet or upward in length two lights must be displayed when at anchor, the stern light lower than the one forward to indicate they are both upon the same vessel and the direction she is pointing. The importance of this is indicated by the occurrence of this accident, and the omission on the part of the barge to observe this rule as to the stern light for the short space of five minutes shows the danger in permitting this regulation to be violated for a moment, and if it be violated, the loss caused by an accident that may occur as a result must fall upon those who are guilty of a failure in this regard. Obedience to this important requirement of the law must be certain and unremitted. The master must know that the lights are continually up. The Oliver (D. C.) 22 Fed. 851. When this light went out there should have been another at hand to put up at once so that the stern of the vessel would not be left in darkness, unguarded by a watch, while a seaman with no special knowledge for the work was attempting to repair a defective lamp. The Erastus Corning (D. C.) 25 Fed. 572; Connolly v. Granite Co. (D. C.) 108 Fed. 99. It is true the law requires a steam vessel entering an anchorage ground upon a dark night, such as this, to carefully feel her way to avoid accidents, and in case of

collision with an anchored vessel, she must repel the presumption of negligence, or make good the loss. The Brady (D. C.) 24 Fed. 300. This we think has been done, and the fault has been shown to be entirely with the barge.

There has been a failure to establish any negligence at all on the part of the pilot boat, unless the speed at which she was running at the time can be said to have in some degree contributed to the accident under the circumstances. She was running at not more than four miles an hour with the tide which it is claimed was carrying her an additional rate of two miles, making a total speed of six miles over the ground. A man can walk four miles an hour, and we cannot say that a vessel was negligent in running at this speed through an anchorage ground. In the case of Rogers v. Steamer St. Charles, 60 U. S. 108, 15 L. Ed. 563 the rate was 9 to 11 miles per hour, and in The Oregon, 158 U. S. 186, 15 Sup. Ct. 804, 39 L. Ed. 943, 15 miles per hour, in both of which cases it was held to be negligent, but it is always a question of fact in each particular case whether the speed was excessive or not, and in determining that question the locality, the hour, the state of the weather, the darkness of the night, the surroundings, and all the circumstances of the occasion are to be fully considered. The Colorado, 91 U. S. 692, 23 L. Ed. 379.

In this case the circumstances established by the evidence, which is undisputed, leads to the conclusion that the collision was the result of the libelant's negligence, and the libel should be dismissed. It is so ordered.