THE ADVENTURESS.

(District Court, D. Massachusetts. April 23, 1914.)

No. 542.

1. COLLISION (§ 71*)—DRIFTING AND MOORED VESSELS—UNSAFE ANCHORAGE.
    A yacht anchored for the night in Bar Harbor, with a southeast storm threatening. During the evening the wind rose, and she dragged her anchors and finally came into collision with libelant's launch, which was lying at moorings, with no one aboard, and by direction of the master the launch was cut loose and drifted on the shore and was wrecked. The master of the yacht did not know the harbor, but made no inquiries of nearby vessels, and anchored where the bottom was rocky and anchors would not hold. There was safe anchorage on the lee of the island, and the wind, which attained a velocity of some 40 miles, was not very unusual at the season. *Held*, that the master was in fault for not inquiring about the anchorage, and for cutting the launch loose without asking assistance from the shore or from other vessels, and the yacht could not avoid liability on the ground of inevitable accident.
    [Ed. Note.—For other cases, see Collision, Cent. Dig. § 101; Dec. Dig. § 71.*]

2. COLLISION (§ 75*)—MOORED LAUNCH—LIGHTS AND WATCHMAN.
    It was not a fault on the part of the launch, which was moored with other boats in shallow water and out of the usual track of moving vessels, that she did not carry lights nor have a watchman aboard; there being no local regulation so requiring.
    [Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 105–121, 207; Dec. Dig. § 75.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Admiralty. Suit by Alfred E. Connors, owner of the launch Rover, against the yacht Adventuress. Decree for libelant.

Benjamin Thompson, of Portland, Me., and Edward S. Dodge, of Boston, Mass., for libelant.

Russell, Moore & Russell, of Boston, Mass., for claimant.

HALE, District Judge. [1] The libelant, surviving partner of the firm of Conners Bros., owner of the launch Rover, claims compensation for damages to that launch, sustained in consequence of her being cut adrift from her mooring at Bar Harbor, Me., by the crew of the yacht Adventuress, on the night of July 28, 1911.

The Rover was known as a cabin launch, and was about 44 feet in length; her beam was 8 to 9 feet; she drew from 4 to 4½ feet of water.

The Adventuress is an auxiliary schooner about 50 feet in length, 15 feet beam; her draft is 7 feet, and she is equipped with a 25 to 50 horse power motor. On the evening in question the Rover was lying at her usual mooring about 1,500 feet off Connors' wharf, between the wharf and the southerly end of Bar Island, about 400 to 600 feet from the island.

The Adventuress is owned by the claimant, who chartered her to Joseph Cullman, Jr., of New York, in July, 1911. She had a crew of four men, all told. She arrived at Bar Harbor about 5 o'clock on the afternoon of July 28, 1911, and anchored in about 25 feet of water, at a point in a northeasterly direction from the Maine Central wharf, a little more out into the harbor than any of the other yachts lying there. Her port anchor was dropped, and 15 to 20 fathoms of chain paid out. The wind was easterly, the barometer low, the weather threatening.

Soon after anchoring, all the yacht's company went ashore except two men and the yacht's crew. The wind soon commenced to breeze up; the sea became rougher. About 8 o'clock the yacht let go her second anchor, and afterwards commenced to drag down towards the steamer El Placita and power boat Shad, both of which were lying astern of her at their moorings. Still farther astern were many other launches and small boats. The yacht continued to drag from a quarter to a half a mile, when she was between the steamer Mascot and the Rover. As the wind hauled more to the southward, she swung over and fouled the Rover. The two vessels were together nearly an hour. During that time, one of the yacht's seamen was twice on board the Rover; the last time he went aboard, by direction of the master, he cut the Rover's mooring, and set her adrift. She was then carried by the strong wind onto the shore of Bar Island, and became substantially a total loss.

The libelant charges that the damage sustained by him was due to the careless, negligent, and improper management and care of the yacht Adventuress by her officers and crew.

The claimant says that at all times those in charge of the navigation of the Adventuress failed in no duty, but were in the exercise of rea-

sonable care in holding the yacht to her anchorage, and in her management after she began to drag; that they carefully used the ground tackle with which the yacht was properly equipped; that the disaster was caused by a force of the wind and sea which could not be. reasonably expected, and against which those in charge of the navigation of the yacht were not bound to provide; that the libelant was promptly notified of the cutting adrift of the launch; and that for the consequences of the unavoidable accident the claimant is not responsible.

The collision occurred between a moving vessel and one lying at her mooring. The burden is upon the moving vessel to account for the collision. She starts with the presumption of fault against her. Does the evidence show affirmatively that the occurrence was one which could not have been avoided by that degree of prudence, foresight, and care which the law requires of every mariner?

About 5 o'clock in the afternoon the Adventuress came to anchor; there was a southeasterly storm coming on; everything pointed to a bad night. Capt. Cardiff, the master, gives substantially the following testimony: That he expected there would be a blow of from 35 to 40 miles an hour; he had no knowledge of the character of the bottom where he anchored; he did not know it was rocky and kelpy, and did not ascertain its character from the chart, or from vessels lying near by; the weather had been threatening all day, with a low barometer; after anchoring it commenced to blow hard, with a choppy sea; it got worse all the time, and during the night it blew harder and rained; the velocity of the wind increased until 12 o'clock; he should call the storm the western edge of a north Atlantic hurricane; at times it was blowing 70 miles an hour; it was blowing so hard a man could not stand without holding onto the rigging; no one in the month of July would expect there would be a blow of 70 miles an hour, although he thought there would be one of 35 or 40; he based his estimate of 70 miles upon experience in two cyclones in the China Sea, and several hurricanes in the North Atlantic; he supposed it was once in 40 years that they get a blow like that. His contention as to what happened during the evening is clearly stated in the answer, and is as follows: After the yacht arrived at Bar Harbor, the port anchor, weighing about 220 pounds, was dropped, with 15 or 20 fathoms of chain; before 8 o'clock the starboard anchor, weighing about 253 pounds, was let go, and further scope given on the port anchor; so that soon after 8 o'clock both anchors were out, with about 40 fathoms of chain on each anchor; a kedge anchor weighing about 125 pounds was also dropped; during the night the wind increased, and more chain was paid out, until about 60 fathoms were out on each anchor; the motor was started, and for a time served to hold the yacht; the wind increased until it was blowing about 70 miles an hour, causing a very heavy sea, and a condition of wind and weather which could not have been reasonably anticipated by those in charge of the yacht; the propeller of the yacht became fouled, disabling the engine; and thereupon, by the unprecedented force of the wind and sea, the yacht dragged her mooring, and drifted towards the launch; the wind shifted from the northeast to the southwest, still blowing heavily; the yacht drifted broadside on-

to the launch; for a long time those in charge of the yacht succeeded in fending off the launch; but with the shifting of the wind this became impossible; one of the crew of the yacht was sent aboard the launch in the attempt to slacken her off and let her drop astern, but she was moored in such a manner that this could not be accomplished; it becoming evident to those in charge of the yacht that, if the vessels continued to pound, both would sink, the moorings of the launch were cut, and she was set adrift.

All those on the yacht swear that the wind was blowing 70 miles an hour during the night. There is some other testimony in support of this contention. The reports of the Weather Bureau on the night in question show, however, that the maximum velocity of the wind at Boston was 34 miles, at Portland 40 miles, and at Eastport 41 miles, an hour. The testimony in behalf of the libelant tends to show that the wind during the night at Bar Harbor did not reach a maximum velocity greatly exceeding the maximum velocity at Eastport, that of 41 miles an hour. The testimony of persons who estimate the force of the wind on any particular night is unsatisfactory. Evidence as to what happened to shipping at the time in question at Bar Harbor is much more convincing. Such evidence is in the case before me. The steam yacht El Placita lay at her mooring near the Adventuress, but a little farther up the harbor. Her master, Capt. Foss, testifies that at 9 o'clock, when he came on deck, it had breezed up considerably; he saw the Adventuress and was sure she would drag; he was so sure of this that he gave orders to his engineer to get up steam, fearing the Adventuress would drift into his own yacht. At 10 o'clock, after the Adventuress had begun to drag, Capt. Foss estimates the velocity of the wind at 35 miles an hour; he saw a small power boat go out by the El Placita's bow, and go around Bar Island, when the wind was at its height; and a 25 or 30 foot launch go across the El Placita's bow. Capt. Mack, of the Constance, testifies that at about 9 o'clock in the evening he went off to Mr. Pulitzer's yacht, the Liberty, in the Constance, a 30-foot launch, with the captain and the doctor, and returned, put the Constance at her mooring, and came ashore in a 12-foot pea pod at Conners' slip. At about 11 o'clock the same night, he went back to the wharf and took the pea pod and went off alone in it to the launch Herbert; then went to the Constance to see if the boats were all right, and it took him about half an hour to do this; that it was rough rowing among the boats, but "nothing alarming," and he had known quite a number of nights when the wind was as strong in Bar Harbor as it was that night. Three or four of the boats chafed off their moorings and went ashore. Capt. Perkins, in the employ of the libelant, says he was on the wharf and in a rowboat practically all night. He went off to look after some catboats in the harbor about 11 o'clock, at which time the wind was blowing 40 or 50 miles an hour. The place where he went was the worst in the harbor on account of shoal water; he had no difficulty in handling a 14-foot rowboat; he had no trouble in carrying out the anchor for the second catboat which had chafed off her mooring. The evidence on this point induces the belief that the wind at Bar Harbor on the night in question attained

about the same maximum velocity as at Eastport, the nearest Weather Bureau station; this was 41 miles an hour.

The whole testimony leads me to believe that the captain of the Adventuress did not exercise the care of a reasonably prudent mariner. His initial fault was in anchoring his yacht for the night in an exposed roadstead, with indications of an easterly storm, and no knowledge of the character of the bottom where he anchored, making no inquiries of others who were familiar with the place, and who were easily accessible to him. An examination of the coast pilot would have informed him that at Bar Harbor the—

"bottom is generally rocky and poor holding ground except near the head of the harbor; the water deepens quickly from four to thirteen fathoms. A swell heaves in during southeast winds, and vessels should not attempt to ride out a gale here from that direction."

He saw a large number of launches and boats lying astern, and knew that in the event the wind and sea should increase, and his vessel should drag, she was liable to foul the El Placita and the Shad, and later to drag down upon some of the many boats lying at their moorings. If he had inquired of Capt. Foss of the El Placita, or of Capt. Simmons of the Shad, he could not have failed to learn that those vessels were lying at moorings, while the position selected for the Adventuress to anchor was a ridge where, if her anchors did start, they would fill with kelp and seaweed, and become useless. He would have found, too, that good anchorage in the lee of Bar Island was easily accessible to the Adventuress at the time she came to anchor.

In view of this testimony, I cannot believe that he exercised the care of a prudent mariner when he anchored his vessel in the most windward and exposed position of any of the large fleet of yachts then at Bar Harbor. without making inquiries as to facts of which he was ignorant, and without examining his chart, to ascertain the character of the bottom. A shipmaster who voluntarily places his vessel in such a position as the Adventuress was placed by Capt. Cardiff on the night in question cannot set up the defense of inevitable accident, when by the prompt adoption of reasonable precautions he could have avoided danger. Under such circumstances he must observe reasonable care and prudence, not only against present dangers, but against impending perils. He must take seasonable measures of precaution. The Syracuse, 12 Wall. 167, 172, 20 L. Ed. 382; The Wenona, 19 Wall. 41, 54, 22 L. Ed. 52. In The Europa, 2 Eng. Law & Equity, 559, Dr. Lushington says that "inevitable accident" must be considered as a relative term, and must be construed, not absolutely, but reasonably, with regard to the circumstances of each particular case. In The Morning Light, 2 Wall. 550, 561, 17 L. Ed. 862, Mr. Justice Clifford remarks that inevitable accident may be regarded as an occurrence which the party charged with the collision could not prevent by the exercise of any ordinary care, caution, and maritime skill. He further remarks in The Merrimac, 14 Wall. 199, 203, 20 L. Ed. 873, that most collisions are unavoidable at the moment they occur; that the primary rule is that precautions must be seasonable; and if they are not so, and a collision ensues in consequence of the delay, it is no valid

defense to say that nothing could be done at the moment to prevent the injury; that it is generally possible to trace the cause of the disaster to some negligent act, or some antecedent omission of duty on the part of one of the vessels. In The Louisiana, 3 Wall. 164, 173, 18 L. Ed. 85, the collision was caused by the Louisiana drifting from her moorings; and the Supreme Court held that she must be liable for the damages consequent thereon, unless she can show affirmatively that the drifting was the result of inevitable accident, or a vis major, which human foresight and a proper display of nautical skill could not have prevented. The court held, further, that the drifting of the vessel was not caused by a sudden hurricane which nautical experience could not anticipate. In that case the wind was a "half gale," a "stiff breeze." It was of such a character that by proper precaution its effects might have been anticipated and prevented. Chancellor Kent has said:

"Vis major, or an act of God, is a natural and inevitable necessity, and one arising wholly above the control of human agencies, and which occurs independent of human action or neglect."

Such a defense cannot be successfully made where the injury could have been avoided by precaution, and nautical skill. The Thule, Fed. Cas. No. 1595. In The Lincoln, Fed. Cas. No. 8354, 1 Lowell, 46, Judge John Lowell held that when one vessel drives upon another at anchor, and in a proper position, the presumption is that the former is in fault. In J. S. Winslow & Co. v. Susquehanna Coal Co. et al. (D. C.) 201 Fed. 174, 176, this court followed the rule laid down in The Louisiana and The Lincoln. In The Olympia, 61 Fed. 120, 123, 9 C. C. A. 393, Judge Lurton fully considers the question of inevitable accident. He quotes from Lord Esher in The Merchant Prince, reported in the Law Reports, Probate Division 179:

"Unless you can get rid of it, it is negligence proved against you that you have run into a ship at anchor: * * * He can only get rid of that proof against him by showing inevitable accident; that is, by showing that the cause of the collision was a cause not produced by him, but a cause the result of which he could not avoid."

In Bradley et al. v. Sullivan et al., 209 Fed. 833, 126 C. C. A. 557, the court found that a vessel which broke from her moorings and injured other moored vessels by collision is liable therefor unless the owners affirmatively show the exercise of proper care, and that the breaking away and drifting were the result of inevitable accident.

As a result of the failure on the part of the captain and crew of the Adventuress to use timely and seasonable measures of precaution in selecting her anchorage, the yacht afterwards came upon dangers from which her crew could not, or at least did not, relieve her. Later in the evening, when it became apparent that a heavy breeze was coming on, a rough sea was making, and the yacht began to drag, the evidence leads me to the opinion that her crew should have started her engines, held her up, and sighted her anchors to see whether or not they were fouled. Even at that time she might have proceeded by her own power to the leeward of Bar Island, where there was a safe anchorage. The whole testimony induces me to believe that the yacht might then

have obtained assistance from the El Placita or the Shad, or even from the shore; for, as I have already pointed out, small launches and small boats were going to and from the wharves all through the evening; and there is testimony from Capt. Conners, who was on the wharf, and from captains of several of the vessels in the harbor, that they could and would have rendered timely and efficient help if any one of them had been called upon by the crew of the Adventuress.

Still later in the evening, when the Adventuress had drifted down upon the Mascot and the Rover, I am of the opinion that reasonable nautical skill and courage would have enabled the crew of the yacht to take a line to the Mascot in order to hold the Adventuress off from the Rover until help could be obtained from the shore. I am persuaded by the whole evidence that there never was a time when it became necessary to adopt the reckless expedient of cutting the Rover adrift. In my opinion, the Adventuress has failed to show affirmatively that her drifting was the result of inevitable accident, or that those in charge of her navigation were justified in cutting the Rover from her moorings, and allowing her to drift upon the lee shore of Bar Island.

The testimony indicates, too, that those in charge of the Adventuress did not exercise good faith in trying to find the owner of the Rover during the evening, or in seasonably notifying him on the morning after the injury.

[2] The learned proctor for the claimants contends in argument that the owner of the Rover was negligent in allowing his launch to lie at her mooring without a watch, on the evening in question. This defense was not, however, set up in the answer.

The testimony shows that, while the Adventuress was afoul of the Rover for nearly an hour, the libelant had at least eight men on the wharf for the purpose of looking after his boats and property; that he had other men off in the harbor looking after other of his vessels, and in assisting small boats; that he had anchors and warps which could readily have been carried, if needed, to the assistance of the Adventuress and of the Rover; that there were lines aboard the Rover, easily accessible, which could have been used to effect the safety of both the Rover and of the Adventuress; and that a reasonably observant and prudent mariner who went aboard the Rover might have found these lines and used them in the exigency in which the boats were placed; that the Adventuress gave no signal to the shore, and called for no assistance. The evidence shows, too, that the Rover was lying with other launches and small boats in comparatively shoal water at moorings, and that none of these vessels had a watch on board. It is not reasonable that boats so moored, out of the usual track of moving vessels, should be under a duty to maintain a watch, or exhibit lights, or to warn approaching vessels of danger, unless local harbor regulations require it, which they did not in this case. The Lucille (D. C.) 169 Fed. 719; The Erastus Corning (D. C.) 25 Fed. 572; The Bridgeport, 14 Wall. 116, 20 L. Ed. 787; The Granite State, 3 Wall. 310, 18 L. Ed. 179.

I find the Adventuress to have been in fault, and the libelant to have been free from fault.

A decree may be entered for the libelant. Albert T. Gould, Esq., of Boston, is appointed assessor to assess the damages sustained by the libelant, and make his report to the court.