THE BRIGHT.

THE HAWAIIAN.

THE SAMSON.

No. 2441.

District Court, D. Maryland.

April 17, 1941.

George W. P. Whip, of Baltimore, Md., for libellant.

Kirlin, Campbell, Hickox, Keating & McGrann (by W. H. McGrann and Eugene F. Gilligan), all of New York City and Ritchie, Janney, Ober & Williams (by Robert W. Williams), all of Baltimore, Md., for the Hawaiian.

Foley & Martin (by Christopher Heckman), all of New York City, and Emory, Beeuwkes, Skeen & Öppenheimer (by John H. Skeen), all of Baltimore, Md., for the Samson and Eastern Transp. Co.

WILLIAM C. COLEMAN, District Judge.

This is a collision case. Three vessels are involved, the barge Bright, the tug Samson and the steamship Hawaiian.

The Hawaiian collided with the Bright while the latter was at anchor about a half mile south of Sharp's Island buoy in the Chesapeake Bay, in the early morning of August 31, 1940. The Bright, a seagoing wooden barge 258 feet long, 46 feet beam, draft 26 feet, fully loaded with sand and gravel, had been placed on her anchorage by the tug Samson on the night of August 28th. Then the Samson proceeded to Cambridge, Maryland, to pick up another barge and so was not at the scene of the collision. The Hawaiian, a cargo steamer, 435 feet long, 53 feet beam, of 4,868 gross tons, was proceeding, partly loaded, up Chesapeake Bay bound from Norfolk to Baltimore, her draft at the time being about 11 feet forward and 19 feet aft. It was a dark night, with no visible horizon, but the atmosphere was clear. The wind was light southwest, and the tide flood. At about one-forty a. m., the port bow of the Hawaiian struck the port side of the Bright abaft her forecastle head, at about a ten-degree angle. The Hawaiian was not injured, but planking was ripped from the Bright, causing her to fill, and she sank at about four a. m., after the Hawaiian had lowered a life boat and taken off the master and crew of the Bright. On September 4, 1940, the master of the Bright libelled the Hawaiian and the tug Samson and her owner, the Eastern Transportation Company, in this Court, claiming damages for the total loss of the barge in the amount of $95,000.

On behalf of the Bright, it is contended (1) that the cause of the collision was the fact that the Hawaiian was proceeding too fast and too close upon the Bright when the Hawaiian knew the Bright to be dead ahead, even though thought to be under way and proceeding in the same direction as the Hawaiian; (2) that even assuming that the Bright was anchored in an improper place, any fault in this respect is attributable solely to the tug

Samson and to the latter's owner for placing the Bright there.

On behalf of the Hawaiian, it is contended (1) that the collision was due to the fact that the Bright was anchored in an unwarranted, dangerous position; was displaying only one anchor light which was near her stern, instead of two anchor lights, one forward and one near her stern; (2) that the Bright might have avoided, or at least greatly lessened, the seriousness of the collision by paying out her anchor chain, as the Hawaiian approached; and (3) that the Samson and her owner are also responsible for placing and leaving the Bright in her unwarranted, dangerous position.

On behalf of the Samson, it is contended (1) that the Bright was properly anchored; (2) that even assuming that she was not, nevertheless, if it should be found that she was displaying only one light and thereby had deceived the Hawaiian into the belief that she, the Bright, was not at anchor but was under way, this intervening act of negligence is not attributable to the Samson and was the sole proximate cause of the collision; and (3) that in any event, the libellant is entitled to the statutory limitation of liability. 46 U.S.C.A. § 183.

The Eastern Transportation Company, owner of the Samson, was permitted to amend its answer so as to include allegations for limitation of liability under the statute just referred to. To this amendment the master of the Bright, libellant, excepted on the ground that the right to limit liability can only be set up by separate petition, pursuant to the provisions of 46 U.S.C.A. § 185; and that since the Eastern Transportation Company has not deposited with this Court, for the benefit of claimants, a sum equal to the amount or value of its interest in the vessel and her pending freight, and has not given approved security therefor; nor has transferred its interest in the vessel and freight to a trustee for the benefit of claimants, the Eastern Transportation Company has not complied with the requirements of the aforementioned statute.

This Court overruled these exceptions, on the authority of The Scotland, 105 U. S. 24, 26, 26 L.Ed. 1001. In that case it was held that shipowners may avail themselves of the defense of limited liability *under the Act of March 3, 1851*, by answer or plea, as well as by the form of proceeding prescribed by that statute, to the extent of obtaining protection against libellants or plaintiffs. That is to say, it was held not necessary for shipowners to surrender and transfer the vessel in order to claim the benefit of the law. The Court said (105 U.S. pages 34, 35, 26 L.Ed. 1001):

"But it is objected that they did not follow the statute by giving up and conveying to a trustee the strippings of the wreck and the pending freight. It is sufficient to say that the law does not require this. It contains two distinct and independent provisions on the subject. One is, that the ship-owners shall be liable only to the value of the ship and freight; *the other is, that they may be discharged altogether by surrendering the ship and freight*. If they failed to avail themselves of the latter, they are still entitled to the benefit of the former kind of *relief. The primary enactment, in sect.* 4283, Rev.Stat. [46 U.S.C.A. § 183], is, that the liability of the owner for any loss or damage, ·without his privity or knowledge, shall in no case exceed the *amount or value of his interest in the* vessel and her freight then pending. Two modes for carrying out this law are then prescribed, one in sect. 4284 [46 U.S.C.A. § 184], and the other in sect. 4285. By *sect. 4284, a pro rata recovery against* the, ship-owner is given to the various parties injured 'in proportion to their respective losses;' and it is added: 'for *that purpose the freighters and owners of the property, and the owner of the vessel*, or any of them, may take the appropriate proceedings in any court, for the purpose of apportioning the sum for which the owner of the vessel may be liable, among the parties entitled thereto.'

"The other mode of attaining the benefit of the law is prescribed by sect. 4285 [46 U.S.C.A. § 185], which declares that 'it shall be deemed a sufficient compliance on the part of such owner, with the requirements of this title, if he shall. transfer his interest in such vessel and freight, for the benefit of such ·claimants, to a *trustee, to be appointed by any court of* competent jurisdiction, &c., from and after which transfer all claims and proceedings against the owner shall cease.' This last proceeding the respondents did not see fit to adopt; but that does not deprive them of the benefit of the preceding section.

"As to the form of proceeding necessary to give the respondents the benefit of sect. 4284, which declares that either party 'may take the appropriate proceedings in any court, for the purpose of apportioning the sum for which the owner of the vessel may be liable,' what more 'appropriate proceeding' could be taken for this purpose, where all the parties are before a court of admiralty, and where the ship-owners plead their exemption under the statute, than to give a decree against them for the amount of their liability, and to distribute the sum amongst the parties entitled to it?"

We are not unmindful of the fact that the Act of March 3, 1851, has been amended since the decision in The Scotland, supra. The most important amendment is the one made in 1936, whereby the vessel owner is required to file his petition for limitation of liability within six months after a claimant shall have given him written notice of a claim, the purpose of this amendment being to cut down the rights and privileges of the shipowner by setting a time limit, where none existed before. 46 U.S.C.A. § 185. In addition to this new provision, to the option given the vessel owner under the old statute to transfer his interest in the vessel and freight to a trustee for the benefit of claimants, was added the further optional right of depositing with the court for the benefit of claimants a sum equal to the amount or value of the owner's interest in the vessel and freight, or approved security therefor. But we do not believe that these amendments destroy the applicability to the present case of the rule laid down in The Scotland, supra. The claim embodied in the amendment to the answer has been made within the six months period, and the fact that the owner is now given, under the statute as amended, two alternative rights where only one existed before, produces nothing new or inconsistent with the rule laid down in The Scotland, supra. See The Irving, D.C., 33 F.Supp. 59.

Turning now to the evidence in the case, we will consider first what is disclosed with respect to the lights that the Bright was carrying at the time of the collision.

Article 11 of the Inland Pilot Rules (33 U.S.C.A. § 180) prescribes as follows the lights that vessels at anchor shall carry:

"A vessel under one hundred and fifty feet in length when at anchor shall carry forward, where it can best be seen, but at a height not exceeding twenty feet above the hull, a white light in a lantern so constructed as to show a clear, uniform, and unbroken light visible all around the horizon at a distance of at least one mile * * *.

"A vessel of one hundred and fifty feet or upward in length, when at anchor, shall carry in the forward part of the vessel, at a height of not less than twenty and not exceeding forty feet above the hull, one such light, and at or near the stern of the vessel, and at such a height that it shall be not less than fifteen feet lower than the forward light, another such light. * * *."

There is a direct conflict in the testimony with respect to whether this rule was complied with by the Bright. Her master was emphatic in his assertion that both the forward and stern lights of proper type, were burning. Further testimony on behalf of the Bright is uncontradicted to the effect that she was equipped with light poles, both forward and aft, of regulation height with cross-arms also set at proper height. It is uncontradicted that, after the collision, the after light was in place and still burning. It is this light which the pilot and the master of the Hawaiian claim they saw and mistook for the after light of a vessel bound up the Bay.

The testimony of the master of the Bright that both lights were burning is reinforced by the testimony of the mate of another steamer, who stated that while coming up the Bay the preceding night and passing the Bright; and also when coming down about half an hour before the collision, he saw both her lights properly in place and had no difficulty in detecting them; by similar testimony of the captain of a tow boat that passed the Bright earlier in the evening; by the testimony of the master of a small freight boat that passed the Bright as his vessel was going up the Bay on the night of the 29th, and also as he passed the Bright again as his vessel was going down the Bay, less than three hours before the collision; by the mate of the steamer Yorktown bound down the Bay as she passed the Bright shortly before ten o'clock on the night of the collision; and—what is particularly significant—by the deposition testimony of the lookout on the Hawaiian herself. Indeed, this latter testimony is very incriminating with respect to the Hawaiian be-

cause her lookout stated that, although he saw both lights when his vessel and the Bright were approximately half a mile apart, or two or three minutes before the collision, he failed to report this fact to the bridge until the vessels were about to collide. His explanation for this failure merely serves to accentuate his negligence, because he said that he made no report of the lights for the reason that he thought they were lighted buoys. He further testified that when the Hawaiian had approached to within about one hundred feet of the Bright, then he saw only one light. At such proximity his vision of whatever lights the Bright may have been carrying may well have been greatly interfered with.

The master of the Hawaiian who, although on the bridge, was not in charge of her navigation at the time, admitted that just before the collision his attention was more on a tow that was passing to starboard than it was on the single fixed white light ahead, which had been visible to him for some twenty minutes but which he, like the pilot of the Hawaiian (whose testimony is hereinafter ·more critically reviewed), thought was on a small vessel moving in the same direction as the Hawaiian. The third officer of the Hawaiian, also on the bridge, testified that ·he ·saw only one white light ahead, which he also thought was on a small vessel, a schooner. A colored mate on a passing steamer testified that he saw only one light on the Bright, shortly prior to the time of the collision. The master of the Yorktown testified that he saw only one light on the barge, but he was not on duty on the bridge at the time, and admittedly was not in such position on his own vessel as ·enabled him to get a complete, unobstructed view of the barge or the lights she was carrying. After the collision, a piece of the Bright's forward light pole was found floating near by, but the forward lamp was not found. The after light pole, with lamp still intact upon it, were salvaged, still in place on the wheel house which floated clear when the Bright sank.

This conflict in the testimony cannot be reconciled. However, we need not ·attempt to do so, in view of the conclusion which we have reached and are about to explain with respect to the effect to be given to the testimony of the lookout and of the pilot of the Hawaiian. Obviously,

the testimony of these persons is highly important and, therefore, must be closely scrutinized, because upon them primarily rested responsibility for safe navigation of the Hawaiian.

With respect to the lookout, enough has already been said to indicate either that he was not a competent lookout, or was performing his duties at the time in a negligent manner. That both was the case is a conclusion fully justified by his own testimony alone. He was properly stationed in the Hawaiian's bow, and was thirty feet above the water. But he admitted no superior had instructed him as to his duties with respect to notifying the bridge of what he saw. It was the duty of the third officer so to instruct him, but he admitted he had not done so, merely assuming, from past observation, that this lookout was competent. Such failure was extreme negligence. Neither the lookout nor his superiors can be absolved from blame merely by his assertion that he was mistaken as to the character of the lights which he saw ahead. It was his duty in any event to report them to the bridge. A lookout cannot act on the assumption that those in charge of navigating a vessel have themselves seen or will see what is ahead, and will identify it. He must diligently and carefully use both his eyes and his ears and must report, under the conditions that existed in the present case, everything heard or seen ahead—all aids to navigation and all other lights or signals. The Ariadne, 13 Wall. 475, 20 L. Ed. 542; The Sea Gull, 23 Wall. 165, 23 L.Ed. 90; The Colorado, 91 U.S. 692, 23 L.Ed. 379; The Madison, 2 Cir., 250 . F. 850; The Felix Taussig, 9 Cir., 5 F.2d 612. In The Colorado, the Supreme Court said (91 U.S. page 699, 23 L.Ed. 379): "Lookouts are valueless unless they are properly stationed, and vigilantly employed in the performance of their duty; and if they are not, and in consequence of· their neglect the approaching vessel is not seen in season 'to prevent a collision, the fault is properly chargeable to the vessel, and will render her liable, unless the other vessel was guilty of violating the rules of navigation. * * *" In The Madison, a lookout's duty was thus defined (250 F. page 852): "A lookout's duty is to report as soon as he sees, not only any vessel with which there is danger of collision, but any which may in any way affect the navigation of his own. He may not himself engage in speculation about

the probabilities of collision, or the relative movements of the two. That responsibility rests upon the master alone."

No further analysis of the situation facing those in charge of the Hawaiian, or of the lookout's testimony, is necessary to support our conclusion that a vessel can never be exonerated from liability under conditions such as those here existing, where her lookout has so greatly failed in the performance of his required duty. In other words, it seems to us that our decision in the present case may well be rested solely upon the admissions of the lookout and his negligence, for it would indeed be a strange principle of admiralty law to say that a vessel is not to be charged with responsibility for colliding, on a clear night, with another vessel whose lights the lookout on the first vessel admits having seen a sufficient length of time prior to the collision to have enabled those navigating his vessel to have avoided the collision, had the lookout then reported the lights.

Thus, whatever else may be true, the lookout's testimony irrespective of other testimony, requires this basic conclusion, namely, that those in charge of the Hawaiian, had they been exercising due care in her navigation, were obligated to assume (1) that she was approaching a *large* vessel, either steam or sailing, which was at anchor, or (2) a *large* steam vessel which was under way, depending upon the relative location and visibility of those lights. Any competent navigator seeing, or having reported to him, ahead, two white lights such as the lookout stated he saw, was bound, for the following reasons, to reach such a conclusion, and having done so, was therefore also bound to slacken speed and to steer wide of the vessel ahead, until she was more accurately identified. All vessels of one hundred and fifty feet or upward in length are required, as already explained, to carry, when at anchor, two white lights visible all around the horizon at a distance of at least one mile, the after light lower than the forward light; so it might have been such a vessel. Vessels of less length shall carry only one such light, the forward one, at a height not exceeding twenty feet above the hull; so it was to be assumed that it was not such a vessel. Inland steamers (except ferryboats) under way are required to carry a central range of two white lights, the after light being higher than the forward light and showing all around the horizon, the forward light showing for only twenty points; and seagoing steamers under way are required to carry one white light forward and may carry another white light placed similarly to the after range light of inland steamers, except visible for only twenty points, like the forward light. Inland Rules, Article 2, 33 U.S.C.A. § 173. So it was to be assumed that it was not either such vessel, in view of the almost dead astern position of the Hawaiian, unless a stern light were being carried. *Any* vessel which is being overtaken by another, except inland steam vessels required to have the after range-light showing all around the horizon, shall show from her stern a white light or a flare-up light. Inland Rules, Article 10, 33 U.S.C.A. § 179. So it might have been a seagoing steamer, under way, with a stern light. While this requirement for a stern light on a vessel being overtaken applies to sailing vessels as well as steam vessels, sailing vessels under way are prohibited from carrying *any other* white light. Inland Rules, Article 5, 33 U.S.C.A. § 174. So it was to be assumed that it was not a sailing vessel under way. Motor boats not more than 65 feet in length, when under way are required to carry only one white light aft. So it was to be assumed that it was not such a boat.

While the Hawaiian thus stands liable on the testimony of her lookout alone, we will, nevertheless, analyze the testimony of her pilot. This, independently of the testimony of the lookout, is very incriminating. He stated that he first saw a dim white light, very low to the water, a couple of degrees on his starboard bow about fifteen or twenty minutes before the collision, at an estimated distance of four or five miles, and south of the buoy; that he thought it was the light on the stern of a small vessel under way, moving in the same direction as his own vessel; that he expected to overtake and leave this other vessel to port, but that the light did not seem to brighten. He said that it seemed to be working across his bow, that it became hardly any brighter—an incredible statement—and that he could not explain this. He was steering directly for the Sharp's Island buoy, on a course north by west. Above the buoy, bound down the Bay, he saw the lights of two tows, one to port about a half a point on the Hawaiian's bow; the other to starboard about a point on her bow. At the time of the collision, the Hawaiian was go-

ing about fourteen knots an hour, that is, full speed and she had been so running from the time she left Norfolk. Perhaps, even though the night was clear, its blackness may have been enough to handicap one's vision and to create uncertainty in the mind of a careful navigator as to the precise location and character of any light seen ahead of the Hawaiian, other than the regular buoy lights. But if there were this handicap, it is undoubtedly clear that safe navigation required that the vessel's speed and course be modified until all doubt was dispelled.

■ The testimony on behalf of the Bright is uncontradicted that the cross arm on her forward light pole was not less than forty-six feet above the water, and the corresponding elevation of her after light was not less than twenty-two feet. So, taking the pilot's own statement that he saw only one light on the Bright, and assuming it might have been either her forward or her after light, still it was not reasonable to have mistaken it for the stern light of a *small* vessel under way because the only type of small vessel under way in such relative position that could lawfully have displayed the stern light alone was a sailing vessel, and obviously no such vessel plying in Chesapeake Bay would be of such hull dimensions or would have such height of stern as to lawfully carry the stern light at anything like as great elevation as twenty-two feet above the water. While the Inland Pilot Rules do not specify the height at which such light shall be shown, they do require that it shall be shown "from her stern"—not aloft. This pilot had thirteen years' experience in navigating Chesapeake Bay. The obvious way to dispel any doubt concerning the vessel ahead was to have used a search-light. The fact that the Hawaiian carried no search-light is not a sufficient excuse, even though such equipment is not required by the pilot rules. We do not say that, independently of those rules, it is negligent per se for a vessel of the size and type. of the Hawaiian, when in Chesapeake Bay, not to be equipped with a search light. But we do say that, in the absence of such equipment, when faced with a situation such as the pilot says he did face, the alternate means for safe navigation should be resorted to, to wit, slackening of speed—even stopping—and altering the course, regardless of the size,

type, or estimated speed of the vessel believed to be ahead.

■ We conclude, therefore, that the Hawaiian was clearly negligent in two respects (1) in not lessening her speed when those responsible for her safe navigation should have known, by the exercise of reasonable care, that a large vessel was ahead, either under way or at anchor; and (2) in not giving a wider berth preparatory to passing the Bright, irrespective of their mistaken belief as to her type or size or that she was under way.

We now turn to a consideration of whether the position of the Bright was improper, and whether it contributed directly to the collision, independently of the question of lights.

■ On behalf of the Hawaiian, it is contended that the Bright's position was unlawful, because hazardous to other vessels. There are no restrictions imposed with respect to where vessels of any size or type may anchor in this part of Chesapeake Bay, since it is a broad fairway. Anchoring in broad fairways, on or near the usual and proper course frequented by vessels, may be unwise, but such an anchorage is not forbidden, unless the vessel so anchored can be avoided only by the moving vessel undertaking a dangerous manoeuvre. The Caldy, 4 Cir., 153 F. 837; The Strathleven, 4 Cir., 213 F. 975. It is contended, however, on behalf of the Hawaiian that, although admittedly there was ample depth and area of water on either side of the Bright to permit a vessel of the Hawaiian's type to pass with the exercise of ordinary care, the rule just stated does not apply when those navigating the vessel that is under way misapprehend that the other vessel is anchored and are misled by the conditions as they appear, among which misleading conditions, it is contended, was the unusual and extraordinary position of the Bright; in other words, that the position of the Bright was not merely a condition, but a proximate cause of the collision.

■ We do not think this contention is tenable under the existing circumstances, because it ignores the true basis for the misapprehension on the part of those in charge of the Hawaiian. That is to say, finding, as we do for the reasons just stated, that those in charge of the Hawaiian were negligent in allowing their misapprehension, reasonable as it might

have been at the start, to carry them on into a position of danger as they did, they cannot be permitted to say that the position of the Bright was a proximate cause of the collision, when her position was not unlawful per se, and when ordinary prudence would have readily disclosed her true character, and whether she was under way or at anchor. The most that this argument made on behalf of the Hawaiian amounts to, is that since the Bright's anchorage was an unusual one, those in charge of the Hawaiian were justified in not anticipating that a vessel would be so anchored. If the Bright's anchorage had actually obstructed the fairway so that the Hawaiian could not, without an unusual manoeuvre, have passed by her; or if the lookout and the pilot on the Hawaiian had not testified as they did, there would be force in the argument. While the Bright's position was in the direct course usually taken for the Sharp's Island buoy, numerous other vessels on the night in question had safely passed the Bright on the same course. We are unwilling to assume, therefore, that her mere position contributed to the collision.

 Counsel for the Hawaiian have sought to make something of the fact that, in the libel, it is charged that the tug Samson was at fault in that she improperly anchored the Bright and left her unattended a short distance south of the buoy; in other words, that this is an admission on the part of the libellant that the position of the Bright was improper. However, we are not disposed to treat the libellant as being prevented by this statement from producing, at the trial, evidence of what is believed to have been the exact facts in the case. The statement referred to is in effect no more than an assertion that, if there was anything unlawful about the anchorage of the Bright, it was due solely to the tug Samson, which placed her where she was.

 Finally, we believe that where, as in the present case, fault on the part of the Hawaiian is established by the unquestioned weight of the credible evidence, and where such fault is of itself sufficient to account for the collision, it would not be enough for the Hawaiian to raise a mere doubt with regard to the care or lack of care with respect to the Bright. "Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor." Alexandre v. Machan (The City of New York), 147 U.S. 72, 85, 13 S.Ct. 211, 216, 37 L.Ed. 84, 85; The Minnie, 4 Cir., 100 F. 128. Decisions upon which counsel for the Hawaiian rely, such as The James Gray, 21 How. 184, 62 U.S. 184, 16 L.Ed. 106, The Santiago, D.C., 160 F. 742, and The Chester O. Swain, 2 Cir., 76 F.2d 890, are not believed to be in conflict with the conclusion here reached, because in those cases there was an actual admission of failure to show the regulation lights.

 It is necessary to say merely a word respecting the remaining argument made on behalf of the Hawaiian to show negligence on the part of the Bright, namely, that the Bright might have avoided, or at least greatly lessened the seriousness of the collision, by paying out her anchor chain, when the Hawaiian was seen bearing down upon her.

It is the duty of a vessel at anchor to adopt such means to avoid a threatened collision as can be taken without extraordinary risk. However, to have attempted to pay out the anchor chain on the Bright, from the time it was first apprehended that the Hawaiian was bearing down upon her, would have been fool-hardy and futile. Time was lacking. To require keeping a crew standing by, on anchored barges under such conditions, would be to exact an unwarranted standard of vigilance. Even if the Bright's crew had been standing by, they still would not have had time to accomplish anything. See The Europe, 9 Cir., 190 F. 475.

In view of our conclusions, it necessarily follows that no liability can be imposed upon the tug Samson.

A decree will be signed in accordance with this opinion, holding the Hawaiian solely responsible for the collision.